**Joan BLANK et al., Plaintiffs,**

**v.**

**TALLEY INDUSTRIES, INC., et al., Defendants.**

**No. 70 Civil 4144.**

United States District Court, S. D. New York.

July 23, 1974.

See also, D.C., 54 F.R.D. 627.

Austrian, Lance & Stewart, P.C., New York City (William Klein II, New York City, of counsel), Cowan, Liebowitz & Latman, P.C., New York City (Alan Latman, New York City, of counsel), for plaintiffs.

Donovan Leisure Newton & Irvine, New York City, for defendant Talley Industries, Inc.; Helmut F. Furth, Brent L. Brandenburg, Michael P. Maloney, Robert M. Hart, Robert Chira, New York City, of counsel.

Cahill Gordon & Reindel, New York City, for defendants Braman B. Adams, II, Donald D. Harrington, John D. MacNaughton, Jr., Peat, Marwick, Mitchell & Co., John C. Robinson, William C. Speed, Wesley A. Stangar, Jr., and John W. Stodder; William E. Hegarty, R. Anthony Zeiger, New York City, of counsel.

Davis Polk & Wardwell, New York City, for defendants Julius Green, Executor of the Last Will and Testament of Charles W. Kennard, Thomas J. Murtagh and Smith, Barney & Co.; Stephen D. Hoffman, New York City, of counsel.

Simpson Thacher & Bartlett, New York City, for defendants Lehman Brothers and William Osborn; Edward C. Mendrzycki, New York City, of counsel.

Rogers Hoge & Hills, New York City, for defendants American Investors Fund, Inc., and George A. Chestnutt, Jr.; Clendon H. Lee, New York City, of counsel.

Kissam & Halpin, New York City, for defendant Joseph D. DiSesa; James G. Simms, New York City, of counsel.

Mudge Rose Guthrie & Alexander, New York City, for defendants Arthur E. Ehlenberger, Gerald E. Hirt and Franz G. Talley; Richard B. Marrin, New York City, of counsel.

Patterson, Belknap & Webb, New York City, for defendant M. Kimelman & Co.

Sidney P. Howell, New York City, for defendants Oscar Kimelman and Thomas F. Reddy, Jr.

Rogers & Wells, New York City, for defendant M. Stuart Roesler; Frederick W. P. Lorenzen, New York City, of counsel.

Richard M. Klein, pro se, and for his wife, Marcella Vail.

OPINION

EDWARD WEINFELD, District Judge.

This is a motion made upon published and direct mail notices to all interested stockholders of General Time Corporation ("General Time") for approval of a proposed class action settlement entered into between plaintiffs and various defendants, including Talley Industries, Inc. ("Industries"). Upon the return of the motion no shareholder opposed or

questioned the settlement, although three objected to redefining the class, referred to hereafter. All parties to the litigation and their counsel urge approval of the settlement. Voluminous affidavits, exhibits and memoranda have been submitted in support of approval. Since these papers review exhaustively the history and scope of the litigation, the court assumes that those interested in the settlement are familiar with the matters that gave rise to the action and the contentions advanced by the respective parties.

The action was instituted by and on behalf of former shareholders of General Time, which was merged into Industries. The principal charges center about a joint proxy statement issued to the shareholders of both companies on April 16, 1970 soliciting proxies in support of the proposed merger. The merger was approved by shareholders of both companies and became effective on May 14, 1970. Under its terms each General Time shareholder received in exchange for his shares, Industries shares. The complaint alleges various causes of action charging violations of the Securities Act of 1933 and the Securities Exchange Act of 1934, and pendent common law claims. The principal claims focus about a $19,000,000 write-off by Industries of excess inventory costs [1] which resulted in a reduction of the net earnings for the fiscal year by approximately $9,500,000, so that earnings for its March 31, 1970 fiscal year were only 43 cents per share, whereas the proxy statement issued to shareholders had shown nine months' earnings at $1.71 per share.

The defendants include Industries and its principal officers; principal officers of General Time; directors of Industries and General Time, three of whom were directors of both; the independent auditors for Industries; the respective investment advisers for both companies; American Investors Fund, Inc., a mutual fund and an affiliate of Industries and General Time under the Investment Act of 1940; and a finder, a brokerage firm, which brought General Time to Industries. All defendants denied and continue to deny the charges levelled against them by plaintiffs.

Matters touching upon some of the claims advanced in this suit and involving the relationship between General Time and Industries have been the subject of other proceedings. Prior to the merger, the Securities and Exchange Commission conducted hearings on an application made by Industries pursuant to section 17(b) of the Investment Company Act of 1940 for an order of exemption from the prohibitions of section 17(a) of the Act, since American Investors Fund, a registered investment company, owned more than five per cent of the outstanding stock of both Industries and General Time, in consequence of which they were deemed "affiliated persons" under the Act. The Commission in January 1970 approved the merger, but only upon condition that changes in the proposed merger plan be

---

1. The inventory valuation was described by Industries' president in a report to stockholders upon the announcement of the write-down as follows:

"Your Company has in the past in its Mesa aerospace operations followed the practice of accounting for its inventory applicable to fixed price United States Government contracts on the basis of the costs incurred and estimated to be incurred on the relative production programs. For the purpose of computing costs of sales it has prorated these costs over the estimated total revenues for these programs. These estimates have been based on actual contracts on hand and future contracts expected by management to be obtained. This accounting practice has resulted in inventories applicable to Government contracts being valued at amounts in excess of the prorated costs of actual contracts on hand, but management has expected sufficient future contracts to be received to recover such excess."

made.[2] The merger terms were revised to reflect the Commission's recommendation and thereafter were approved by the Commission, following which the joint proxy statement was issued and the merger approved by the stockholders of both companies.

After this suit had been in litigation for almost three years, the SEC in 1973 commenced an action in this court against Industries, its chief executive officer, its treasurer and chief financial officer, and its independent auditor, also based upon the April 1970 proxy statement which led to the merger. The complaint in essence charged that the proxy materials were false in various material respects similar to the basic charges made in this class action, and also alleged violations of the securities acts based on filings of forms 10–K and registration statements. In the SEC suit the named defendants also denied and continue to deny the allegations of the complaint. The SEC action was settled as to all defendants except the independent auditor, as to whom it is still pending. The stipulation of settlement takes note of the proposed settlement of this action, and provides if this suit is not settled substantially as proposed, the final judgment in the SEC action is to be vacated nunc pro tunc.

## THE PROPOSED SETTLEMENT

Under the merger, the former General Time stockholders received in exchange for each share of General Time common stock owned by them on the date of the merger one share of Industries B preferred, and for each share of General Time preferred so held, four shares of Industries B preferred stock. At the time of the merger there were outstand-ing 2,193,660 shares of General Time common stock (excluding 257,937 shares of such stock owned by Industries) and 327 shares of General Time Series A preferred stock.

The settlement consists of cash, notes and warrants to be distributed to General Time common and preferred shareholders who were entitled to receive Industries B preferred stock upon the merger on May 14, 1970. The maximum contributions are as follows:

| (Cash) | | |
|---|---|---|
| Industries | $4,500,000.00 | |
| 2 other defendants | 888,962.04 | |
| | | $5,388,962.04 |
| (Notes) | | |
| Industries promissory notes due 11/30/78 | | $5,850,000.00 [3] |
| (Warrants) | | |
| 5-year warrants for purchase of an aggregate of 712,500 shares of Industries Series B preferred exercisable at the rate of $12 per share.[4] | | |

The agreement provides that if any members of the class entitled to participate in the settlement fail to do so or fail to establish their claims, the respective defendants' contributions shall be reduced pro rata in proportion to the value of each defendant's maximum contribution, referred to above, and for that purpose the notes shall be valued at their principal amount and the warrants at $4 each. Fees, disbursements and expenses allowed by the court shall be deducted "off the top," i. e., pro rata from each shareholder's distributive share, but if less than all participate, then the portion of the fees, disbursements and expenses allocable to such non-participating shares shall be paid by defendants pro rata.

If the notes and warrants are valued on the pro rated basis provided for in

---

2. In re Talley Industries, Inc., SEC Investment Co. Act Release No. 5953 (Jan. 9, 1970).

3. Interest to run from payment date at the rate of 9⅜% per annum or a per annum rate equal to ⅜ths of 1% above the prime lending rate in effect on the payment date for 90-day maturities of the Chemical Bank of New York, whichever is higher, payable semi-annually.

4. In the event a holder of a warrant does not exercise his rights thereunder within the five-year period, he is entitled to receive $4 in cash from Industries.

the agreement, the distributions to be made to former General Time shareholders (but subject to proportionate deduction of fees, disbursements and expenses) for each share of Industries B preferred received by them in exchange upon the merger are as follows: cash, $2.455, plus $2.665 in principal amount of notes, plus 32.46% of a warrant, valued at $1.30 (32.46% of $4.00), or a total of $6.42 per share. Under this computation the maximum settlement figure is $14,088,062.

The proposed agreement also contains provisions with respect to the listing on a national securities exchange of the Series B preferred stock to be issued upon the exercise of rights under the warrants or of conversion rights under the preferred stock, as well as the registration of the securities under the securities acts; further, in the event of approval of the settlement, the action is to be dismissed as to all defendants on the merits as against the plaintiffs, but without prejudice as against those persons who are no longer members of the class. There are many other provisions of the agreement, the substance of which is set forth in the notice sent to shareholders.

The proposed settlement was reached only after vigorous and sustained activity by the contending parties. Its terms were negotiated over an extended period. It came as the climax to thorough pretrial discovery on the part of the plaintiffs and defendants. The examination of the parties and witnesses on both sides was complete; interrogatories propounded to one another had been answered and thousands of documents had been examined, abstracted and were available for trial. The parties were fully prepared for trial; indeed it was on the eve of trial, which the court indicated would be required to go forward,

that the parties concluded the agreement.

■ The court's function in passing upon this application is not "to reopen and enter into negotiations with the litigants in the hope of improving the terms of the settlement,"[5] nor is the court called upon to substitute its business judgment for that of the parties who worked out the settlement. Rather, in substance, it is called upon to evaluate the probabilities of success upon a trial and to compare the benefits thereof with the terms of the compromise.

An immediate advantage, of course, is the obvious one that the termination of this litigation will permit the executive and other important officers of Industries, whose time and energies were diverted from the advancement of the corporate interest by pretrial activities, to return to their normal day to day functions, which of necessity must benefit the shareholders. However, the shareholders' concern in the settlement is more personal: the recovery of damages resulting from what has been at the hard core of this litigation, the claim that their General Time shares were under-valued and Industries shares received in exchange were over-valued.

First, as to the probability of success: The essential charge, as previously noted, centers about the $19,000,000 write-off on June 25, 1970, forty-one days after the merger was effected. A study of the record compels the conclusion that the conditions which led to the write-off did not come into being overnight. The excess cost inventory accounting method employed by Industries was based upon forecasts of anticipated future government contracts which, to say the least, were unduly optimistic in the light of experience—indeed, they were unrealistic. An exhibit, unearthed during the pretrial procedure, which reports on a

5. Levin v. Mississippi River Corp., 59 F.R.D. 353, 361 (S.D.N.Y.), aff'd on opinion below sub nom. Wesson v. Mississippi River Corp., 486 F.2d 1398 (2d Cir.), cert. denied, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973).

conference attended by Industries officials and representatives of the independent auditors (defendants herein) would, in the event of a trial upon the merits, give strong support to plaintiffs' claims.[6] Taken together with other significant documents, as well as the testimony of various defendants and others, they all add up to a showing of probable success upon a trial. Assuming that plaintiffs prevail, but without deciding so, we consider the benefits of the settlement in comparison with those that might be derived in the event of judgment in plaintiffs' favor.

The second amended complaint sets forth three claims. The first alleges violations under sections 14(a), 10(b), 20(a) and 29(b) of the 1934 Act, and Rules 14a-9 and 10b-5 thereunder, and sections 11, 12(2), 15 and 17(a) of the 1933 Act. This claim charges fraud in the 1970 Merger Proxy Statement and a manipulative and deceptive scheme to merge. The second claim is against Industries alone and charges it with common law misrepresentation and misleading course of conduct. The third claim alleges common law breach of fiduciary duty against most defendants. The relief sought under the claims includes rescission, or in the alternative damages equal to the difference between the value of the General Time shares given and the Industries preferred received; also, punitive damages.

It was recognized from the inception of the litigation that rescission was not feasible. When a motion to dismiss various causes of action was made soon after the commencement of suit, the court (Metzner, D.J.) noted, "Insofar as plaintiffs seek rescission of the merger . . . [it] is totally impractical in this case."[7] This view was based upon the fact that at the time of the merger Industries and General Time had thousands of shareholders and millions of shares outstanding which were heavily traded, with the consequent difficult—if not the well-nigh impossible—task of tracing the shares, so that those who may be entitled to rescission could be identified. Subsequently, the court (Gurfein, D.J.), in making the class action determination, observed, "[I]t would appear at this stage of the proceeding that rescission is so remote as not to be a factor in the class determination."[8] With rescission out of the case, the offer of settlement must be evaluated against the likely recovery of money damages.

The cash, notes and warrants, if taken at face value, as noted above, total $14,088,062 or $6.42 per share. Plaintiffs' financial expert estimates that the present value of the settlement package amounts to almost $15,000,000, or $6.82 per share. This court, however, is of the view that since the notes are future obligations, as are the warrants if the rights thereunder are not exercised immediately, some discount should be applied to reduce the total package to present worth. Even so, the settlement package would not be far from the estimated $14,088,062 to $15,000,000.

The parties disagree as to the applicable measure of damages in the event plaintiffs were to prevail and also as to the criteria to be applied in determining the damages. As in all these matters, there are as many theories advanced as there are experts expressing opinions. Plaintiffs' theories would maximize damages; the defendants' would minimize them. Plaintiffs would seek to ap-

---

6. *See* Exhibit 15, memorandum by Peat, Marwick's Audit Supervisor, summarizing meeting on June 15, 1970, between Peat, Marwick's representatives and Industries' representatives, including its lawyer, principal executive officer, principal financial officer and others (particularly page 3).

7. Basch v. Talley Industries, Inc., 53 F.R.D. 9, 12 (S.D.N.Y.1971).

8. Basch v. Talley Industries, Inc., 53 F.R.D. 14, 18 (S.D.N.Y.1971).

praise, as of the merger date, the true value of General Time, which they claim was manipulatively depressed by defendants, and the true value of Industries preferred, which they claim was manipulatively inflated, with the difference reflecting the total damage sustained by General Time shareholders. Plaintiffs' theory is that since recission is not feasible, the "damages should come as close as possible to making the General Time shareholders whole"[9] by applying standard valuation methods in appraisal cases. This concept would give consideration to such factors as book value, capitalization of earnings,[10] asset value upon distribution, liquidation, past performances and future potentials.[11] The claimed damage would be the difference between the value so computed for General Time shares and the value of the Industries preferred received in exchange after taking into account the effect of the inventory write-off. Presumably the difference would yield a higher damage per share than the $6.42 or $6.82 referred to above.

The defendants, on the other hand, would confine the issue of damages by concentrating on the value of the Industries preferred, for which purpose its market price is deemed the principal factor. Thus upon a trial they would urge, based upon an expert's opinion, that even if plaintiffs were successful the total recovery would not exceed $3.80 per share for each share of Industries Series B preferred stock received by the former General Time shareholders (excluding Industries), an aggregate of $8,300,000 before prejudgment interest. This expert attempts, by various formulae, referred to as "sophisticated analytical techniques," to determine the effect of the inventory write-off on the value of the Industries Series B preferred stock. The result reflects the difference between the actual value of the Industries preferred stock received by the former General Time shareholders and the allegedly inflated value resulting from defendants' alleged misrepresentations and concealments of Industries' true financial condition and business prospects. The expert readily acknowledges that plaintiffs' theories of damages, if adopted, would result in substantially higher recovery than his projected $8,300,000.

■ The disparate results which follow from the application of the differing theories of the parties still leave open the issue of the correct measure of the damages. The court is not convinced that either theory is compelled under the facts of this case. Another approach may satisfy the damage issue. While not entirely conclusive, a pretty fair indicator of value is the market place where the shares of both companies were freely traded before the merger, and thereafter when Industries preferred continued to be traded. As this court has recently observed:

"The market evaluation of a stock may reflect a more realistic appraisal of its value than a conceptual evaluation. Theory must yield to the reality of the market place, 'the true appraiser.' Indeed, to quote Judge Learned Hand . . .: 'When all is said, value is nothing more than what people will pay . . . .' "[12]

9. Plaintiffs' Memorandum in Support of Proposed Settlement, at p. 58.

10. *Cf.* Levin v. Mississippi River Corp., 59 F.R.D. 353, 368–369 (S.D.N.Y.), aff'd on opinion below sub nom. Wesson v. Mississippi River Corp., 486 F.2d 1398 (2d Cir.), cert. denied, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973).

11. *Cf.* Norte & Co. v. Huffines, 288 F.Supp. 855, 858 (S.D.N.Y.1968), aff'd in part and remanded in part, 416 F.2d 1189 (2d Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970); Diston v. Loucks, 62 N.Y.S.2d 138, 144 (Sup.Ct.1941), aff'd, 264 App.Div. 758, 35 N.Y.S.2d 715, leave to appeal denied, 264 App.Div. 838, 35 N.Y.S.2d 763 (1942).

12. *See* Levin v. Mississippi River Corp., 59 F.R.D. 353, 370 (S.D.N.Y.), aff'd on opinion below sub nom. Wesson v. Mississippi River

Applying this pragmatic approach to the issue of damages, the maximum recovery plaintiffs could realize would be the difference between General Time common the day before the merger, $14.875, and the low for the Industries preferred received in exchange which, following the publication of the inventory write-off on June 25th dropped, and thereafter on July 7, 1970 slumped to a low of $9.25 per share, which may be deemed to reflect the market's appraisal of the depreciated share. Thus under this concept the damages would be $5.625 a share—about 80 cents less than the $6.42 per share settlement—an aggregate in excess of $12,300,000. Taking into account that under a settlement no definitive judgment is required with respect to the measure of damages, the total settlement package clearly is reasonable and fair and reflects adequate compensation for the losses sustained by the General Time shareholders upon the exchange of their stock for the Industries shares. They could hardly fare much better upon a trial.

Another factor favoring the settlement, and ·one entitled to substantial weight, is that it bears the imprimatur of seasoned and experienced counsel and their investment analysts and advisers, who deem its terms eminently fair.[13] The settlement was reached only after the completion of extensive and complete pretrial discovery and arms-length bargaining, which was not only vigorous but at times even acrimonious. It is also of some significance that prior to the hearing no objection was made by any shareholder to the aggregate settlement amount. As of June 14, 1974, proofs of claim were received from claimants representing 1,120,193 shares of General Time stock, over fifty per cent of all General Time stock outstanding on the merger date (excluding Industries holdings). Only five requests for exclusion were received, totalling· only 325 shares.

■ Finally, as previously noted, the matters at the heart of this litigation have. been the subject of Securities and Exchange Commission inquiry and litigation. Although the SEC was given notice of the hearing of this application for approval of the terms of the settlement, it neither appeared nor submitted any expression of its views. Thus, while not receiving affirmative endorsement by the SEC, the settlement has been subjected to its scrutiny and it is fair to assume that if there were any untoward aspects of the settlement this would have been brought to the court's attention. In sum, upon a consideration of all pertinent factors, this court is satisfied that the terms of the settlement are fair and reasonable, and accordingly it is approved.

## THE MOTION TO REDEFINE THE CLASS

■ We next consider the motion to redefine the class, which presently consists of all persons other than the defendants who were the beneficial owners of General Time's outstanding common or preferred stock on April 13, 1970, the record date for the special meeting to be held on May 14, 1970 to vote on the merger.[14] If granted, the effect of the

Corp., 486 F.2d 1398 (2d Cir.), cert. denied, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973).

13. Levin v. Mississippi River Corp., 59 F.R. D. 353, 366 (S.D.N.Y.), aff'd on opinion below sub nom. Wesson v. Mississippi River Corp., 486 F.2d 1398 (2d Cir.), cert. denied, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973). *See* Cannon v. Texas Gulf Sulphur Co., 55 F.R.D. 308, 316 (S.D.N.Y.1972); Percodani v. Riker-Maxson Corp., 50 F.R.D. 473, 477 (S.D.N.Y.1970); Schleiff v. Chesapeake & O. Ry., 43 F.R.D. 175, 179 (S.D.N. Y.1967); Glicken v. Bradford, 35 F.R.D. 144, 152 (S.D.N.Y.1964); Fielding v. Allen, 99 F.Supp. 137, 144 (S.D.N.Y.1951). *But cf.* Cohen v. Young, 127 F.2d 721, 725 (6th Cir. 1942).

14. Fed.R.Civ.P. Rule 23(c)(1) provides:
"(C) DETERMINATION BY ORDER WHETHER CLASS ACTION TO BE MAINTAINED; NOTICE; JUDG-

change in class will be to (1) exclude from the class former General Time shareholders as of April 13, 1970, who sold or otherwise disposed of their stock prior to May 14, 1970; (2) include in the class those who acquired General Time stock after April 13, 1970, and held such stock on May 14, 1970; and (3) include in the class defendants other than Industries who were General Time stockholders on May 14, 1970.

When the action was commenced it was brought on behalf of two classes: (1) the Proxy Fraud Class, which consisted of General Time shareholders of record on April 13 entitled to receive the proxy statement and who exchanged their shares for Industries preferred; (2) the Stock Fraud Class, which comprised those who bought or sold General Time stock between December 1967, when Industries first started to buy General Time shares with an eye to the merger, and when the merger was consummated. As to the Stock Fraud group, the original complaint alleged a conspiracy by the defendants to depress the market price for General Time shares and to puff the value of Industries, with consequent damage to members of that group who bought and sold General Time. The court (Gurfein, D. J.), in making the class action determination, limited the class to the Proxy Fraud group. It found that none of the named plaintiffs were members of the Stock Fraud Class, since they retained and exchanged their shares upon the merger and so their claims for damages were covered by the Proxy Fraud Class. The court was further of the view that those who, like the named plaintiffs, bought General Time stock within the claimed conspiracy period and did not sell it before the merger were not damaged by the alleged manipulative practices; indeed, they were beneficiaries of the alleged fraud, since they acquired their shares at depressed prices.[15] Although afforded an opportunity, no member of the Stock Fraud Class sought to join the action; accordingly, it proceeded on behalf of only the members of the Proxy Fraud Class. Thereafter, the second amended complaint was served, which, while asserting claims of conspiratorial manipulation, deleted reference to the Stock Fraud Class, and limited the claims to the unfairness of the merger terms, to wit, the value of General Time surrendered on May 14, 1970 by the Proxy Fraud Class, and the value of Industries preferred received in exchange. The basis of the redefinition of the class is that the General Time shareholder who sold after April 13 but prior to the merger became the beneficiary of the market's acceptance of Industries inflated or puffed financial condition and hence was not damaged; that those who were damaged were the General Time shareholders who surrendered their stock on May 14 and received Industries preferred in exchange, which the second amended complaint alleges was over-valued by reason of defendants' conduct. Upon analysis this reasoning appears sound and the redefinition of the class is approved.

The shareholders now eliminated from the class—that is, those who were record owners on April 13, 1970, and received the merger proxy statement, but thereafter sold or disposed of their General Time shares before May 14, 1970—are protected. The settlement stipulation provides they shall not be bound by the judgment and also contains as to them

---

MENT; ACTIONS CONDUCTED PARTIALLY AS CLASS ACTIONS.

"(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained.

An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

15. Basch v. Talley Industries, Inc., 53 F.R.D. 14 (S.D.N.Y.1971).

an adequate provision whereby the statute of limitations is tolled.[16]

## THE RESTORATION OF DEFENDANTS TO THE CLASS

█ Under the class action order entered by Judge Gurfein, defendants (except Industries) were excluded from the class with the express proviso that they could seek re-entry if the action were dismissed against them. The settlement proposes that this group be restored to the class. All parties to the litigation favor their inclusion as fair. At the hearing one shareholder objected upon the ground that they were alleged participants in the claimed wrongful acts and should not be permitted to share in the benefits of the settlement. The inclusion of defendants under the redefined class would affect only American Investors Fund (the affiliate of both Industries and General Time), and three outside directors of General Time whose holdings total 120,000 shares, which did not change between April 13 and May 14. There is no evidence to support the charge that these defendants engaged in any manipulative or other activity to depress the value of General Time in the period preceding the merger, or that they knew of or in fact anticipated Industries $19,000,000 write-off. These directors testified upon their depositions in substance that with respect to the accounting treatment of the excess inventory costs they relied in great measure upon Franz G. Talley, the chief executive of Industries, who gave repeated assurances, orally and in writing, that the prospects of future orders were bright and that nothing he said or did suggested that he was overly optimistic in his predictions, which had they come true

would not have required the write-off of excess inventory costs. Their testimony does not appear to be challenged, despite intensive examination of them. In this circumstance, however naive they may have been, and whatever their responsibility for their reliance upon Mr. Talley's optimistic representations, they too were imposed upon no less than those shareholders who did not hold office. Moreover, the directors had been advised by a "comfort letter" issued by Industries' independent public accountants, among other matters, that nothing had come to their attention to indicate that the unaudited financial statements for the nine months ended December 31, 1969 would require any material adjustments for a fair and reasonable presentation of the information shown. Finally, plaintiffs' counsel state that "[i]t is doubtful that they [outside directors] were on sufficient notice of irregularity to warrant the belief that they knew or should have known that the financial statements were false or misleading."[17] Since these outside directors received Industries B preferred in exchange for their General Time shares, they sustained damages to the same extent as other General Time shareholders and there is no reason to deprive them of the benefits of the settlement. The application to include them in the class is granted.

## APPLICATIONS FOR ATTORNEYS' FEES AND OTHER ALLOWANCES AND EXPENSES

There remains for final consideration the application by the two law firms who represented plaintiffs in this action for allowance of fees in the sum of $3,055,000, plus $85,000 to cover their

16. The toll period is from September 24, 1970, when this action was commenced, until that date when the judgment approving the settlement shall, by lapse of time or otherwise, become final and no longer subject to appeal. The notice of proposed settlement was sent to all who held General Time

shares either on April 13 or May 14, 1970, and they were advised of the foregoing provision.

17. Plaintiffs' Memorandum in Support of Proposed Settlement, at p. 38.

disbursements and accountants' and experts' fees; by Industries for an allowance of $225,000 to cover the out-of-pocket expenses in performing certain administrative and clerical functions related to the proposed settlement and in acting as disbursing agent, and to Chemical Bank, New York, for its services in acting as escrow agent. Notice of these applications was included in the notice of settlement sent to the shareholders. Two shareholders sent in written objections to the attorneys' fees, but it appears that in the main their views were based upon an assumption that such allowance as may be granted will be on an all-cash basis. In this they are in error since the attorneys' fees will be paid in the same proportion as shareholders' participation, to wit, cash, notes and warrants. Upon the argument, Industries, which is obligated to pay the share of fees and expenses attributable to non-participating shareholders, indicated objection to the amount of the fees requested by plaintiffs' attorneys. The court also noted that if only fifty per cent of the shareholders filed claims which were allowed, the attorneys are requesting $3,055,000 as against an actual payment of about $7,500,000, to which counsel responded that the balance of the settlement is available to those filing proper proofs. In any event, counsel have not yet filed a complete and detailed affidavit of services,[18] and since Industries seeks to examine plaintiffs with respect thereto, the fixing of fees will be deferred. It is desirable, however, that approval of the settlement be filed as expeditiously as possible to permit the shareholders to obtain the benefits of the award as promptly as possible.[19]

The settlement is approved and judgment may be submitted with an appropriate provision to effectuate its terms.

18. *See* City of Detroit v. Grinnell Corp., 495 F.2d 448, 470–473 (2d Cir. 1974).

19. The stipulation of settlement provides that within 5 days after entry of the order

approving it, the paying defendants are to deposit $1,077,792.40 in escrow to carry interest; as the balances of required payments are made, they also are to bear interest until distributed to the shareholders.