Manuel CONTRERAS, as Trustee of the K. E. Knotts Co. Profit Sharing Trust, individually, on behalf of all shareholders of the Cambridge Fund, Inc., and derivatively on behalf of the Cambridge Fund, Inc., et al., Plaintiffs,

v.

TWEEDY, BROWNE & KNAPP, Edward L. Anderson, Howard S. Browne, Thomas P. Knapp, Christopher H. Browne, John P. Spears, Carl B. Boyer, Wilfred J. McNeil, Richard M. Seybold, Tweedy, Browne, Inc., Norte & Co., Joseph P. Galdi, Robert Waller, NCD Financial Corp., the Waller Trust, the Cambridge Fund, Inc., and TBK Partners, Ltd., Defendants.

No. 75 Civ. 1749.

United States District Court,
S. D. New York.

July 18, 1977.

Webster & Sheffield, New York City, for plaintiffs; Donald Stuart Bab, New York City, of counsel.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for defendant The Cambridge Fund, Inc., now known as Asset Investors Fund, Inc.; Charles H. Miller, New York City, of counsel.

Reavis & McGrath, New York City, for defendants Tweedy, Browne & Knapp, Edward L. Anderson, Howard S. Browne, Thomas P. Knapp, Christopher H. Browne, John P. Spears, Wilfred J. McNeil, Richard M. Seybold, Tweedy, Browne, Inc., Robert Waller, NCD Financial Corp., The Waller Trust, and TBK Partners, Ltd.; Gerald A. Eppner, David C. Birdoff, New York City, of counsel.

Austrian, Lance & Stewart, New York City, for defendants Norte & Co. and Joseph P. Galdi; William Klein, New York City, of counsel.

EDWARD WEINFELD, District Judge.

This suit was brought as a class action on behalf of shareholders in the Cambridge Fund, Inc. (the "Fund"), a closed-end mutual fund now known as Asset Investors Fund, Inc., and derivatively on behalf of the Fund against the brokerage firm of Tweedy, Browne & Knapp, its general partners and two companies affiliated with it (collectively "TBK"),[1] and against several directors and shareholders of the Fund. TBK acquired, in January 1974, a controlling interest in the Fund and thereafter replaced the Fund's management and investment advisor. The complaint charges the defendants with breaches of fiduciary duties existing under the common law and under the Investment Company Act of

---

1. The action is brought against TBK Partners, Ltd., a successor to Tweedy, Browne & Knapp, a New Jersey limited partnership, which is also named as a defendant, and against Tweedy, Browne Inc., a wholly-owned subsidiary of Tweedy, Browne & Knapp, which was organized to conduct brokerage and investment advisory activities for the Fund. For the purposes of the present application, it is not necessary to differentiate between these defendants, and they will thus be referred to collectively as "TBK."

1940,[2] and with violations of the antifraud provisions of the Investment Advisors Act of 1940 [3] and the antifraud and proxy solicitation provisions of the Securities Exchange Act of 1934.[4] The defendants have denied the allegations of the amended complaint.

Before the Court at this time is a motion for approval of a settlement negotiated by the parties.[5] For purposes of evaluating the proposed settlement, the Fund, which had originally been represented by counsel for TBK, was required to obtain independent counsel. The Fund also enlisted the services of an independent financial expert to assist it in assessing the settlement proposal. The attorneys for the various parties and the Fund's expert have recommended approval of the settlement as fair, reasonable and advantageous to all concerned. Notice of the proposed settlement was given to the shareholders of the Fund, only three of whom registered objections at a hearing held by the Court on April 26, 1977.[6] Two objectors are Frank J. Abella, Jr., the former Chairman of the Board and President of the Fund, who was also the sole shareholder of the Fund's prior investment advisor, and his wife.

In December 1973 and early January 1974, TBK, pursuant to section 13(d) of the Securities Exchange Act,[7] filed a schedule 13D and amendments thereto with the Securities and Exchange Commission indicating that it intended to acquire control of the Fund for the purpose of entering into a new investment advisory agreement with the Fund and acting as the Fund's broker in its portfolio transactions. In early January, the Fund's then management, which had already brought suit against TBK on the basis of the latter's filings with the SEC, determined to liquidate the assets of the Fund and distribute the proceeds to the shareholders. At the time, the book value of the assets per share exceeded the price at which the Fund's shares were trading on the market. On January 9 and 10, 1974, TBK purchased approximately twenty-six per cent of the Fund's outstanding stock from two shareholders, Robert Waller and Joseph Galdi, who are defendants in the present action. TBK thus gained working control of the Fund and was able to prevent the proposed liquidation, to have its nominees elected to the Fund's Board of Directors at the 1974 shareholders meeting, and to obtain shareholder approval of a new investment advisory agreement between itself and the Fund.

## FACTUAL BACKGROUND

After TBK obtained control of the Fund and had ousted Abella, a series of lawsuits were commenced in which one or the other contestant for control of the Fund charged its adversary with various violations of the securities laws. A number of these actions are still pending but have not resolved the precise issues presented in this action, nor have they affected TBK's position as the Fund's controlling shareholder and investment advisor.

Under TBK's control, the Fund has apparently experienced a change in its investment policy. TBK seeks to invest in companies with a relatively low price-to-earnings ratio, and it concentrates on companies with substantial assets and book values relative to the market prices of their securi-

**2.** 15 U.S.C. §§ 80a–1 to –52.

**3.** 15 U.S.C. §§ 80b–1 to –21.

**4.** 15 U.S.C. §§ 78a–78kk.

**5.** *See* Fed.R.Civ.P. 23(e), 23.1. The Court certified this suit as a class action when it signed the order for the hearing on the proposed settlement.

**6.** One of these shareholders raised an objection at the time of the hearing, which was resolved by a stipulation of the parties.

**7.** 15 U.S.C. § 78m(d). Section 13(d) requires a Schedule 13D to be filed by any person who acquires five per cent of any class of equity securities required to be registered under the Exchange Act. The schedule contains information about the background and identity of the person filing, the source of funds used to make purchases of stock, the amount of stock beneficially owned, the purpose of the purchases, any plans the purchaser proposes to implement if he gains control over the issuer, and any contracts or understandings he has with other persons concerning the securities of the issuer.

ties. According to the Fund's financial expert, this policy "is at variance with the prevailing views of Wall Street," in that it reflects a conservative approach to investments, appraising them on the basis of their intrinsic value, or value upon liquidation of the issuer, rather than on the basis of how the market price of the security being considered would be expected to react to management policies, changes within the relevant industry, forces acting on the market, etc. According to one of the shareholder's objecting to the settlement, TBK's philosophy is also at odds with that of a majority of the Fund's former shareholders.

The present action was filed on April 10, 1975, by the Abellas. Simultaneously, they moved for a temporary restraining order and a preliminary injunction enjoining commencement of the Fund's imminent annual shareholders meeting. The temporary restraining order was granted, but after reviewing the parties submissions on the motion for a preliminary injunction, the Court denied that relief, noting at the time that the litigation was "a battle between two investment advisors to obtain control of the [Fund] to get the benefits of the payment of fees." Thereafter, additional shareholders were granted permission to intervene.

Preliminary settlement discussions ensued, but by the end of June 1976 no definitive agreement had been reached, although some progress had been made. On July 12, 1976, after the cut-off date for completion of discovery, the Magistrate in charge of the case disqualified plaintiffs Abella from acting as class or Fund representatives since Mr. Abella was the defendant in a separate pending suit by the Fund wherein he was charged with overreaching the Fund and various violations of fiduciary duty. Further, the Abellas were unwilling to execute a general release, which was a sine qua non of the settlement discussions. The defendants had insisted that they required a general release from each named plaintiff, all of whom, except the Abellas, had agreed

thereto. Upon the Abellas' disqualification, a new representative plaintiff was substituted in their place; the settlement discussions were renewed and finally on September 17, 1976 the parties reached a mutually acceptable settlement. Thereafter the direction was made for review by the independent counsel.

## THE PROPOSED SETTLEMENT

The proposed settlement is fairly complex, and its minutia need not be set forth here; essentially, the settlement would give the Fund's shareholders an opportunity to tender their shares to TBK—or at the Fund's option, to the Fund—at a price significantly above that which could be obtained on the open market.

For purposes of the settlement, two classes of shareholders are differentiated: first, those who intervened in the litigation as plaintiffs ("Plaintiffs"), and second, other shareholders who did not intervene (the "Class"). Under the settlement, TBK agrees to purchase from the Plaintiffs, and the Plaintiffs agree to sell to TBK, all the Plaintiffs' stock in the Fund at a price equal to 74.8 per cent of the net asset value of each share. The Fund itself has the option of making a tender offer to all members of the Class, except the Abellas, for between 40,000 and 50,000 shares, at the same price. This decision is to be made by the Fund's independent directors, i. e., those unaffiliated with TBK.[8] If the Fund elects to make the offer, TBK will purchase all tendered shares in excess of the amount sought by the Fund; if the Fund is not tendered as many shares as it seeks, TBK agrees to sell it the shares purchased by TBK from the Plaintiffs and, if necessary, as many additional shares, up to a maximum of 10,000, as are needed to satisfy the Fund's tender offer. If, on the other hand, the Fund decides not to make the tender offer, or is prevented from doing so by unfavorable Securities and Exchange Commission ac-

8. At the hearing on the proposed settlement, counsel for the Fund indicated that after consultation with an independent financial expert, the Fund's unaffiliated directors had determined that it would be in the best interests of the Fund to make a tender offer pursuant to the settlement agreement.

tion, TBK will itself make an offer to the class for any and all of their shares at 74.8% of their net asset value, but in any event at a price not less than $5.50 per share.[9]

In addition, the settlement provides that if within one year after the Plaintiffs sell their shares to TBK, the Fund merges, consolidates, liquidates or is made subject to another tender offer by the defendants or their affiliates, the Plaintiffs and those members of the Class that tendered shares pursuant to the settlement tender offers will receive from TBK any consideration in excess of 74.8 per cent of the net asset value per share that accrues to shareholders by virtue of the corporate reorganization, liquidation or tender offer. TBK also agrees to pay all costs associated with the tender offers under the settlement; to indemnify the Fund for any adverse tax consequences of the settlement; and to pay plaintiffs' attorneys fees of $20,000, if the Court approves. Furthermore, the intervenor Plaintiffs and the defendants (except the Fund) agree to exchange general releases with respect to claims relating to the Fund, and the Fund agrees to dismiss with prejudice the derivative claims in the action.

■ The Court's function in passing upon the proposed settlement is neither "to reopen and enter into negotiations with the litigants in the hope of improving [its] terms",[10] nor to substitute its own business judgment for that of the parties and their counsel, who worked out the settlement. To do so would defeat the very purpose of compromise, which courts encourage to avoid a determination of sharply contested issues and to dispense with expensive and wasteful litigation with its hazard of uncertain result. Rather, the Court is called upon to evaluate whether the settlement is fair and reasonable in light of the probability that plaintiffs will establish their claims at trial and in light of the benefit that would accrue to them thereby.[11]

## PLAINTIFFS' CLAIMS

The amended complaint contains eight counts, the material allegations of which are denied by all the defendants. Count I alleges that TBK has breached, or threatens to breach, its fiduciary duty owed to the Fund under the Investment Company Act of 1940 [12] by charging the Fund excessive management and brokerage fees and expenses, including expenses incurred by TBK in connection with the 1974 annual stockholders meeting at which TBK ousted previous management. Plaintiffs allege that the advisors fees charged to the Fund, when expressed as a percentage of asset value, are somewhat higher than those paid by other mutual funds. However, it is by no means apparent that such fees were excessive under the circumstances, especially since the Fund has a relatively low asset value. It is further unclear whether under the Investment Company Act TBK would be precluded from charging the Fund for expenses incurred in connection with the 1974 annual meeting. Some portion of the total fees charged was, of course, appropriate under any standard. Plaintiffs, even

9. In the event that 74.8 per cent of the net asset value of one share is less than $5.50, TBK need not accept any tendered shares and the named Plaintiffs need not sell their shares to TBK. In such a case, the settlement would not be consummated, and the case would proceed to trial.

10. *Levin v. Mississippi River Corp.*, 59 F.R.D. 353, 361 (S.D.N.Y.), *aff'd sub nom.*, *Wesson v. Mississippi River Corp.*, 486 F.2d 1398 (2d Cir.), *cert. denied*, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973).

11. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455, 462–63 (2d Cir. 1974); *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); *Saylor v. Lindsley*, 456 F.2d 896, 904 (2d Cir. 1972); *Voege v. Ackerman*, 67 F.R.D. 432, 435–36 (S.D.N.Y.1975); *Blank v. Talley Indus., Inc.*, 64 F.R.D. 125, 129 (S.D.N.Y. 1974); *Levin v. Mississippi River Corp.*, 59 F.R.D. 353, 361–62 (S.D.N.Y.), *aff'd sub nom.*, *Wesson v. Mississippi River Corp.*, 486 F.2d 1398 (2d Cir.), *cert. denied*, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973); *West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740–41 (S.D.N.Y.1970), *aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

12. 15 U.S.C. § 80a–35(b).

assuming their success on this hotly-contested count, would not be likely to recover in excess of $100,000.

Count II charges defendants TBK, Galdi and Waller with violations of section 17(d) of the Investment Company Act [13] in connection with Galdi's and Waller's sale of their stock in the Fund to TBK in January 1974. This sale assisted TBK in gaining control of the Fund. One of the terms of the sale was that, if TBK did gain control of the Fund, Waller would purchase from the Fund certain securities held in its portfolio. Section 17(d) prohibits affiliated persons of registered investment companies [14] from participating in any transaction in which the company is also a principal except in accordance with rules and regulations adopted by the SEC "for the purpose of limiting or preventing participation by . . . [the] company on a basis different from or less advantageous" than that of the affiliated person.[15] Count II charges that TBK, Waller and Galdi, apparently affiliates of the Fund at the time of the transaction, violated section 17(d) because TBK paid a "premium" to Waller and Galdi for their shares that was not offered to other Fund shareholders and because TBK's takeover was effected, in part, through the sale of Fund assets to Waller.

Plaintiffs' Count II claims are legally dubious since section 17(d) is concerned with transactions in which the Fund and its affiliates, not the Fund's shareholders, participate on an unequal basis. The only participation of the Fund in the transaction at issue consisted of the sale of certain of its portfolio assets to Waller. These securities were selected for sale by TBK, however, because their retention by the Fund was deemed inconsistent with TBK's investment practices. Moreover, when the securities were sold to Waller, the Fund realized approximately $25,000 over their market price at the time, and the Fund was not required to pay fees or commissions on the sale. It can be argued with great plausibility that the transaction was beneficial to the Fund. Indeed, pursuant to rules adopted under the Investment Company Act,[16] the SEC issued an order exempting the sale of securities to Waller from the provisions of section 17.[17] In sum, the possibility that plaintiffs could prevail on the claims asserted in Count II is far from certain.

In Count III plaintiffs charge that TBK violated sections 10(b) and 14 of the Exchange Act [18] by engaging in a tender offer for the Fund's shares while acting as a market maker in those shares. It is also alleged that TBK, Waller and Galdi violated these provisions of the securities laws because the price paid by TBK for Waller's and Galdi's stock in the Fund reflected a premium that was not offered to other shareholders of the Fund. These claims are predicated on the allegation that TBK's schedule 13D, which announced TBK's intention to acquire a controlling interest in the Fund,[19] taken in conjunction with TBK's purchases of Fund shares constituted a "tender offer" as that term is used in the Exchange Act. Although the term "tender offer" has not yet been precisely defined, it is questionable that TBK would be found to have engaged in a tender offer; its activi-

13. 15 U.S.C. § 80a–17(d).

14. The term "affiliated person" is defined at 15 U.S.C. § 80a–2(a)(3).

15. 15 U.S.C. § 80a–17(d).

16. 17 C.F.R. § 270.17d–1.

17. The SEC found that "[t]he terms of the proposed sale by the Fund to Mr. Waller . . . are reasonable and fair and do not involve overreaching on the part of any person concerned and are consistent with the policy of the Fund and with the general purposes of the Act." See 15 U.S.C. § 80a–17(b)(2)(3). Of course, the fact that the SEC found the terms of the sale to be fair and reasonable and exempted it from section 17 does not preclude the plaintiffs from asserting in this action that the transaction in fact violated section 17. Harriman v. E. I. du Pont de Nemours & Co., 411 F.Supp. 133, 158 (D.Del.1975); Entel v. Allen, 270 F.Supp. 60, 66 (S.D.N.Y.1967); see, e.g., E. I. du Pont de Nemours & Co. v. Collins, 432 U.S. 46, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1977).

18. 15 U.S.C. §§ 78j, 78n.

19. See note 7 supra.

ties did not bear the usual earmarks of a tender offer, and control of the Fund was achieved primarily through a few private stock purchases.[20] Thus plaintiffs' prospect of probable success at trial on the claims asserted in Count III is, to say the least, doubtful.

In Count IV, plaintiffs charge that TBK, while acting as the Fund's investment advisor, breached it duties under the Investment Advisors Act [21] by purchasing shares of the Fund for its own account at a time when the net asset value of such shares exceeded their market price. Plaintiffs claim that TBK thus misappropriated to itself the premium between the market price and net asset value of the shares and that, by not purchasing shares on behalf of the Fund, TBK maintained the net asset value of the Fund, and therefore its advisory fees, at an artificially high level.[22] TBK may have had a duty to refrain from purchasing the Fund's shares under the circumstances, but at this juncture it is sufficient to note that difficult legal and factual issues attend the claims in Count IV and that recovery of damages on those claims is by no means assured.

The remaining counts in the complaint simply charge that TBK failed to reveal in its proxy statements to the Fund's shareholders the securities laws violations alleged in Counts I through IV and that the actions claimed to have been taken by TBK constituted breaches of a common law fiduciary duty. Success on these remaining claims will obviously depend heavily upon whether plaintiffs prevail upon the claims in Counts I through IV. As noted, all defendants deny the charges of wrongful conduct and

in the event of a trial the issues would be vigorously contested. In sum, the Court is convinced that plaintiffs would encounter substantial difficulties with respect to factual and legal issues in prevailing upon their various claims at trial and in obtaining any material recovery of damages from the defendants.

## ADVANTAGES OF SETTLEMENT

An immediate advantage of settlement, of course, is that termination of this class action litigation will allow TBK to devote a substantially greater amount of its time and energy to its investment advisory activities, thus benefitting the Fund and its shareholders. Indeed, according to the Fund's independent financial expert, the pendency of this litigation may have had an adverse impact on the Fund.

■ More importantly, the proposed settlement will give the Fund's shareholders an opportunity to liquidate their holdings at a price above the market price. Because the Fund is closed ended and because there is a very thin market for its shares, those shareholders who disagree with TBK's conservative investment policies were nevertheless virtually locked into their investments after the takeover. The settlement permits all such shareholders to tender their shares and receive proceeds greater than those obtainable on the open market. Of course, those shareholders that are content with TBK's management need not tender their shares. They may nevertheless reap substantial benefit, since the Fund itself, if, as is expected, it chooses pursuant to the settlement to make a limited offer for its

---

**20.** *See, e. g., Copperweld Corp. v. Imetal,* 403 F.Supp. 579, 598 (W.D.Pa.1975); *D–Z Investment Co. v. Holloway,* CCH Fed.Sec.L.Rep. [1974–75 Binder] ¶ 94,771 (S.D.N.Y.1975); *Water & Wall Associates, Inc. v. American Consumer Indus., Inc.,* CCH Fed.Sec.L.Rep. [1973 Binder] ¶ 93,943, at 93,752, 93,759 (D.N.J. 1973); *Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co.,* 356 F.Supp. 1066, 1074 (S.D.N.Y.), *aff'd,* 476 F.2d 687 (2d Cir. 1973).

**21.** *See* 15 U.S.C. § 80b–6. The Court of Appeals for this circuit has only recently held an

implied private right of action for damages to exist under section 80b–6. *Abrahamson v. Fleschner,* 568 F.2d 862 (2d Cir. 1977).

**22.** Had TBK made purchases of shares for the Fund's account, however, as plaintiffs contend it should have, an argument could be made that TBK's own control over the Fund would have been further solidified by the reduction in outstanding shares and the net asset value of TBK's shares in the Fund would have been increased at the expense of the Fund.

own shares, will effect an increase in the net asset value of those shares left outstanding. Moreover, TBK has agreed to indemnify the Fund's shareholders for any adverse tax consequences of the settlement. The tender offers under the settlement, which, of course, will be subject to the Williams Act,[23] will be made with full disclosure, and shareholders will thus be in a position to make an informed decision whether to tender.

As already noted, the only two shareholders who have outstanding objections to the proposed settlement are the Abellas, the original plaintiffs in this suit. They attack the settlement on the grounds that the claims in the complaint are meritorious, that the tender office price for the Fund's shares should be 100 per cent of their net asset value, and that they should not be precluded from participating in the Fund's proposed tender offer. The bulk of the Abellas' objections are obviously colored by resentment of and active animosity towards TBK, emotions that are perhaps understandable coming as they do from the deposed leadership of the Fund. However, the Court disagrees with their sanguine view that success at trial for the plaintiffs is all but assured; indeed, the risk of litigation in this case is sizable. Moreover, the assertion that the proposed tender offers should be made at 100 per cent of the net asset value ignores both the uncertain outcome of litigation and the realities of the marketplace. The tender offer prices are greater than the market price for shares, which can be taken as valid economic indicators of their worth.[24] The market for the Fund's shares is thin, and the tender offers thus guarantee the shareholders liquidity that they otherwise would not enjoy. Further, it is unlikely that the Fund's portfolio could be liquidated at 100 per cent of its net asset value, because many of the shares held therein have very thin and volatile markets. Finally, the settlement precludes the Abellas from participating in any tender offer by the Fund because they are unwilling to execute general releases in favor of TBK as all other named plaintiffs and intervenors are required to do under the settlement. The Abellas cannot insist on enjoying the benefits of the settlement without actually settling their claims.[25] At any rate, Mr. Abella brought this suit individually as well as derivatively and in a representative capacity, and under the settlement he will be free to pursue his individual claims against the defendants. On the other hand, if the Abellas consent to execute general releases, they are to be included as offerees in the proposed tender offers.

In light of the substantial risks and expenses of litigation, and taking into account the recovery that the plaintiffs might be expected to obtain were the uncertainty pervading their claims resolved in their favor, and upon a consideration of the views and recommendations of independent counsel, the independent financial expert, and shareholder objectors, the Court approves the settlement as fair and reasonable to all concerned.

Submit order in accordance with the foregoing.

**23.** 15 U.S.C. § 78n.

**24.** *See Borg v. International Silver Co.,* 11 F.2d 147, 152 (2d Cir. 1925); *Blank v. Talley Indus., Inc.,* 64 F.R.D. 125, 131 (S.D.N.Y.1974); *Levin v. Mississippi River Corp.,* 59 F.R.D. 353, 370 (S.D.N.Y.), *aff'd sub nom., Wesson v. Mississippi River Corp.,* 486 F.2d 1398 (2d Cir.), *cert. denied,* 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973).

**25.** The defendants assert that the Abellas at one time proposed the very settlement agreement presented before the Court and that their present opposition is motivated by a purpose to compel the Fund to discontinue the pending lawsuit against Abella. Since the Court finds the settlement fair and reasonable, no purpose would be served in considering this contention.