Sandra KUCK, Ruth Bartashunas (a/k/a Ruth Bart), Sheryl Bauman, Deborah Cassetta, Margaret Maureen Coleman, Barbara Gould (a/k/a Barbara Cusanelli), Joann Karlsson, for themselves and all others similarly situated, Plaintiffs,

v.

**BERKEY PHOTO, INC., Berkey Marketing Co., Defendant.**

78 Civ. 3788.

United States District Court, S. D. New York.

May 29, 1980.

---

**76**

Janice Goodman, New York City, for plaintiffs.

Benetar, Isaacs, Bernstein & Schair, New York City, for defendant; Kenneth D. Stein, New York City, of counsel.

Wolfe & Woll, New York City, for Class Member Gayle Watnick; Harvey L. Woll, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is a motion for approval of a proposed settlement of a class action claim and the allowance of counsel fees. After due notice to all members of the class, a hearing was held at which only one member entitled to participate in the settlement opposed its approval. After full consideration of the terms of the proposed settlement and the contentions of the proponents and the opponent, the Court is satisfied that it is fair and reasonable and that further litigation is not warranted. Accordingly, the settlement is approved.

The action was commenced by seven female plaintiffs individually and as a class action on behalf of females who were employed on or any time after June 28, 1975 by defendant Berkey Photo, Inc., Berkey Marketing Companies ("Berkey"), and who are or were employed at an hourly rate at Berkey's Woodside, New York plant.

One cause of action charged sex discrimination in violation of Title VII of the Civil Rights Act of 1964 [1] based upon the defendant's practice of limiting female employees to a 37½-hour work week, whereas men worked a 40-hour week, thereby depriving the female employees of 2½ hours employment income per week. When this policy was changed on May 31, 1976 and the women gained a 40-hour work week, further discrimination is alleged in that the men were granted a wage increase, which was not accorded to the women. The second cause of action charges discrimination against female employees in hiring, promotion, and segregation of departments by sex; and an entirely separate cause of action charges retaliatory conduct against the named plaintiffs following the filing of charges by them with the United States Equal Employment Opportunity Commission and the New York City Commission on Human Rights. The Court certified the discrimination claim as a class action on behalf of all female, hourly-paid non-union employees employed by Berkey at its Woodside, Long Island facility on and after September 27, 1975.[2]

The parties engaged in extensive pretrial discovery, including the depositions of witnesses, production of hundreds of documents and numerous interrogatories. Various motions in advance of trial were made, including one by plaintiffs for summary judgment. That motion was denied, the Court holding that disputed issues of fact precluded summary judgment; further, that even if a policy of disparate treatment existed, plaintiffs could only recover upon

1.  42 U.S.C. § 2000e–5.

2.  81 F.R.D. 736 (S.D.N.Y.1979).

proof of injury, which was not established upon the motion.[3] The case was marked ready for trial, a pretrial order was entered and extensive trial briefs submitted. Expert witnesses and labor economists were consulted by the parties to prepare statistical materials for use upon the trial and to testify thereat. The issue of liability was to be tried first, and if plaintiffs succeeded in establishing liability under the class action claim, each member of the class still would have to prove that she, individually, was financially injured by the defendant's policy. With the trial, estimated to require thirty trial days, imminent, the parties engaged in extensive settlement discussions and agreed upon the proposal now before the Court for approval.

The defendant, from the very inception of the trial to the present, has denied plaintiffs' charges; it has contended that at all times it has been in full compliance with the provisions of Title VII and all other laws, rules and regulations governing discrimination in employment—indeed, its position with respect to the class action claim is that, if anything, the men were discriminated against.[4] Notwithstanding its denial of any violation, defendant asserts that the tremendous cost of continued litigation, particularly in view of a month-long trial and the prospect, in the event plaintiffs prevailed on the liability issue, of many mini-trials to determine individual damage claims involving additional expense led it to agree to a settlement as a matter of business judgment.

In general, under the proposed settlement the defendant has agreed to provide the following relief:

(1) Payment of specified amounts to each of the seven named plaintiffs in settlement of their claims for back pay, retaliation, employment discrimination under Federal and State law, and their expenses in connection with this action, totalling $62,000 for the entire group.

(2) Distribution of $30,000 back pay to certain members of the class (excluding the named plaintiffs) based upon years of full-time non-seasonal employment by defendants. The members of the class who were hired prior to May 31, 1976 and were still in Berkey's employ as of December 31, 1979, are to receive compensation payments based upon a formula taking into account years of service. Those class members, not in Berkey's active employ as of December 31, 1979, but who were hired before May 31, 1976 and had at least three years continuous service with Berkey at the time of termination also share in the settlement. All those entitled to participate are divided into sub-classes based on years of service. Sub-classes A through D are still active employees of the defendant; the only difference among those four categories is that those in sub-class A have the greatest number of years of service and sub-class D, the fewest. Sub-class E is composed of employees who no longer are in defendant's employ but who did have three full years of employment prior to termination.

(3) Goals and timetables for utilization of women in managerial, supervisory, sales and professional jobs—an effort to achieve integration by sex in all major job categories.

(4) A job evaluation study and wage administration program to establish uniform pay scales for comparable non-exempt, non-union jobs; also, pay adjustments for jobs that will be classified upward. Berkey is obligated to allocate $22,500 to the development and implementation of the Wage Administration Program and to adjustments, if any are required, to the pay of non-exempt, non-union female employees resulting from the implementation of the Wage Administration Program.

(5) Promotional Programs, including a career counseling program to assist women in developing skills that would qualify them for promotional opportunities.

---

3. 85 F.R.D. 39 (S.D.N.Y.1979).

4. It claims that all employees, male and female, holding comparable positions were paid the same weekly salaries; but the men were required to work longer hours to obtain that amount.

(6) Personnel changes designed to ensure greater equality of employment opportunity for women, including job posting, development of internal promotions and referral systems, and annual performance appraisals.

(7) Subject to Court approval, payment by Berkey to plaintiffs' attorney of $50,000 for counsel fees and $22,000 reimbursement of expenses incurred in the litigation.

Upon approval of the settlement and entry of judgment thereon, it shall have binding and res judicata effect as to all claims and rights of each member of the class for damages, back pay and benefits with respect to the alleged unlawful sex discrimination.

The sole opponent of the plan, one of 190 members of the class, centers her objection upon the formula applied in determining the various sub-classes to share in the distribution of $30,000. She does not attack the settlement qua settlement, but concentrates her opposition upon the different amounts to be received by those in the different sub-classes, and contends that "E," her sub-class, will be treated unfairly and disproportionately in the distribution.

█ The Court's function on this application is well known—it is not to reopen and enter into negotiations with the litigants in the hope of improving the settlement to meet an objector's particular objections; nor is the Court called upon to substitute its business judgment for that of the parties who worked out a settlement after hard, arm's-length, good-faith bargaining.[5] Rather, it is called upon to evaluate the probabilities of success upon a trial and to compare the benefits thereof with the terms of compromise.

As already noted, the defendant from the onset of this litigation has resisted plaintiffs' discrimination claims (as well as the others) and continues to do so. Had the case proceeded to trial, whether it consumed the estimated thirty days or not, there was no assurance that the class claim

would have been sustained, despite the vehemence of plaintiff's position. The agreement reflects substantial benefits to the class as reflected by the program to assure integration by sex of all major job categories, and to achieve goals for females as specified in the agreement in terms of designated percentages of the total number of employees in various job groups, including officials, managers, marketing professionals, and sales representatives. Another benefit is an affirmative action program based upon the defendant's commitment to full equal employment opportunity for women, with specifications for its implementation. These and other benefits weigh heavily in favor of the settlement.

We now turn to the objections advanced and defendant's position in response.

The basis for setting up the $30,000 fund was a calculation with respect to back pay, in the event plaintiffs succeed, that the defendant's total exposure to liability would approximate $85,000. The defendant compromised this aspect of the matter and agreed to a back pay fund of $30,000 and also to finance a wage study at a cost of $22,500, totalling more than sixty percent of maximum potential damage liability. Further, the defendant contends, as it did in opposition to the summary judgment motion, that even if plaintiffs established liability based on the policy in effect up to May 31, 1976, no damages would be recoverable by many of the women because many, in certain periods, worked in excess of thirty-seven and a half hours and thereby received overtime pay, which would offset any back pay liability. This, of course, was another disputed matter.

In working out the compromise on back pay, it was decided that with the change of hours policy in effect on June 1, 1976, those hired from that date would not share in the back pay fund, since any claim of damage was de minimis. Plaintiffs' counsel was of the view that this group would be benefitted by the wage analysis which was intended to rectify inequalities in salary differentials.

---

**5.** *See Levin v. Mississippi River Corp.,* 59 F.R.D. 353 (S.D.N.Y.), *aff'd,* 486 F.2d 1398 (2d Cir. 1973). *See also Blank v. Talley Industries, Inc.,* 64 F.R.D. 125 (S.D.N.Y.1974).

The negotiators then decided the distribution of the fund was to be based on years of seniority and current employment with Berkey. These employees are included in sub-classes A through D, those in A having the greatest years of service, and sub-class D the fewest. Thus those with greater seniority receive more back pay. The objector's class, sub-class E, includes those no longer employed by Berkey but who were employed three full years prior to termination. The approximate individual back pay awards estimated to be received by each member of the sub-class are as follows:

| Sub-Class | Amount | Number of Members | Date of Hire | Date of Termination |
|-----------|--------|-------------------|--------------|---------------------|
| A | $963 | 20 | On or before 12/31/72 | After 12/31/79 |
| B | 802 | 3 | In 1973 | "          " |
| C | 561 | 3 | In 1974 | "          " |
| D | 321 | 8 | Between 1/1/75 and 5/31/76 | "          " |
| E | 241 | 17 | Prior to 5/31/76 | Prior to 12/31/79 but with at least 3 years service |

One group of the class membership, numbering 135 members, referred to on this motion as sub-division F, do not participate in the $30,000 distribution. Most of this group were employed after May 31, 1976 when Berkey changed its thirty-seven and a half hour per week policy, and consequently they sustained little, if any, damage as a result of the alleged discriminatory policy. Members of this group were employed for various short-term periods, ranging from less than three months and in all cases less than three years; in some instances the group includes employees hired as late as the end of February 1980. The objector, stressing the difference that she, as a sub-class E member is to receive compared to the amounts to be paid to sub-classes A through D, argues that the differentials are so disproportionate as to be unfair.

Those who negotiated the contract were of the view that the sub-classes were justified since the longer one was employed, the greater the damages suffered, assuming injury could be established upon a trial. They also were of the belief that persons who were still employed by the company continued to be affected by the impact of defendant's alleged past discrimination policy, particularly with respect to promotions, whereas this did not apply to those who were no longer employed by defendant. Berkey had an additional reason for setting up the sub-class formula—it was more interested in satisfying its present employees than those who had terminated their employment. It cannot be said that the motivating purposes which underly the distribution formula are unfair or irrational. And since the distributions to the various classes are based upon a seniority concept and resulting greater damage, they reflect a reasonable adjustment.

Moreover, both counsel for the class action plaintiffs and the employer stress that as to the objector, there is no basis for a claim of individual unfairness—although the Court notes that the settlement must be passed upon on the basis of its overall provisions in determining its fairness. They contend that if upon a trial the class action plaintiffs prevailed, it is questionable that she could establish entitlement to any damage. She was employed from December 1974 through October 6, 1976. She was an hourly-paid employee between December 1974 and May 31, 1976, the relevant back pay period when she earned between $4.00 and $4.80 an hour. Assuming liability, the loss of pay based on two and half hours of work per week during that period amounts to $849. She received overtime during that

period of $811.70, which the defendant contends is to be offset against any claim. Thus a payment to her of $241 is in excess of what defendant's as well as plaintiffs' attorney contend she could recover as damages.

Additionally, Berkey notes that since the disputed policy was changed on May 31, 1976, and the objector was required to file any claim on her own behalf (separate from this action), any claim asserted now is time barred. Significantly, the objector herself has submitted no affidavit controverting the contentions of plaintiffs' and defendant's counsel as to her status of employment with defendant. Finally, the attack upon December 31, 1979 as the cut-off date for inclusion of employees within the subclasses A through D is without substance. Since the objector was no longer employed at that time, it is difficult to understand her concern about the date. In any event, the parties decided that a cut-off date was desirable in order effectively to foreclose claims, and since they consummated the agreement at the time designated, there is no reason why it should not be accepted.

Just as it is recognized that the ideal of a perfect trial is rarely attainable, so, too, with a perfect settlement.[6] Indeed, the very nature of the settlement process, involving arm's-length negotiations contemplates a yielding on the part of the contenders according to perceived strengths and weaknesses of their respectively asserted positions—and this is particularly so where factual issues germane to liability are in dispute which at once precludes certitude of judgment, absent a trial. What was said in another context is applicable here: "The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise;

in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation."[7]

■ The Court is satisfied that the proposed settlement is fair and reasonable as to all class members, and it is approved. Also, applying the criteria set forth in *City of Detroit v. Grinnell*[8] and upon a consideration of the affidavits of plaintiffs' counsel detailing the required information as to services rendered, the Court is of the view that the counsel fee agreed upon and the amount of disbursements are fair and reasonable and, accordingly, it is approved.

So ordered.

---

6.  *See United States v. Corey*, 566 F.2d 429, 433 (2d Cir. 1977); *United States v. Birnbaum*, 373 F.2d 250, 257 (2d Cir.), *cert. denied*, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967); *United States v. Kahaner*, 317 F.2d 459, 485 (2d Cir.), *cert. denied*, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963). *Cf. Moore v. Illinois*, 434 U.S. 220, 232, 98 S.Ct. 458, 466, 54 L.Ed.2d 424

(1977); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

7.  *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

8.  495 F.2d 448, 455 (2d Cir. 1974).