Richard A. WEINBERG, Maciej Kopacz, Jaewook Kim, as Partners of Weinberg, Kopacz & Kim; E. Ronn Heiner, Alan Pierrot, Donald Huene, Barbara Noyes, as Partners of Heiner & Peirrot; Raymond Schwartz, Richard Wheatley, Sathaporn Vathayanon, as Partners of Schwartz, Wheatley & Vathayanon, Plaintiffs,

v.

LEAR FAN CORPORATION, (a Nevada Corporation); Lear Avia Corporation (a Delaware Corporation); Lear Fan Ltd. (an English Limited Company); Lear Fan Corporation (US) (a Delaware Corporation); Oppenheimer & Co., Inc. (a Delaware Corporation); Zoysia Corporation, N.V. (a Netherlands Antilles Corporation); Fan Holdings, Inc. (a Delaware Corporation); Samuel H. Auld; William W. Surbey; Moya Olsen Lear; and Bob Burch, Defendants.

No. 84 Civ. 1689 (EW).

United States District Court, S.D. New York.

Feb. 5, 1986.

Wolf Popper Ross Wolf & Jones, New York City, Sharon Green, Inc., San Francisco, Cal., for plaintiffs; Robert A. Skirnick, Patricia I. Avery, New York City, Sharon Green, San Francisco, Cal., of counsel.

Schulte Roth & Zabel, New York City, for defendant Oppenheimer & Co., Inc.; David M. Brodsky, E. Scott Gilbert, Debra L. Mellinkoff, of counsel.

Davis Polk & Wardwell, New York City, for defendants Lear Fan Corp., LearAvia Corp., Zoysia Corp., N.V., Fan Holdings, Inc., Samuel H. Auld, Bob Burch, Moya Olsen Lear, and William W. Surbey; Scott Muller, Robert Kasdin, of counsel.

Davis Graham & Stubbs, Denver, Colo., for Darl G. Hobson, Chapter 11 Trustee for Lear Fan Ltd. and Lear Fan Corp. (US); Glen E. Keller, Jr., C. Randel Lewis, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is a motion, upon notice to all members of the proposed class, for approval of a settlement pursuant to Fed.R.Civ.P. 23(e) and for the allowance of attorneys' fees to plaintiffs' counsel.

Plaintiffs, nine medical doctors and one Ph.D, commenced this action in October 1983 in the United States District Court for the Eastern District of California on behalf of themselves and a class of approximately 200 purchasers of limited partnership interests in the Lear Fan Research Limited Partnership ("LFRLP" or "the Partnership"). The Partnership was formed in 1980 to finance research and development for a proposed lightweight business aircraft, the Lear Fan 2100. In March 1984, the action was transferred to this Court, where plaintiffs filed an amended complaint.

The defendants, Lear Fan Corp. (a Nevada corporation), Lear Fan Ltd. (an English Limited Company), Lear Fan Corp. (US) (a Delaware corporation), LearAvia Corp. (a Delaware corporation) (collectively referred to as "the Lear Fan defendants"), Oppenheimer & Co., Inc. (a Delaware corpora-

tion), Zoysia Corp., N.V. (a Netherlands Antilles corporation), Fan Holdings, Inc. (a Delaware corporation), Samuel H. Auld, Moya Olsen Lear, William W. Surbey, and Bob Burch, moved to dismiss several of the claims alleged in the amended complaint and opposed class certification. In March 1985, this Court dismissed four counts of the amended complaint and granted plaintiffs' motion for leave to file a second amended complaint. After the Court's dispositions of the parties' motions rendered plaintiffs' motion for class certification moot, the parties agreed that plaintiff would have until January 15, 1986 to move for class certification under the second amended complaint.

The litigation arose from the sale in 1980 of limited partnership interests in the Partnership to provide $30 million for research and development of the Lear Fan 2100. Having spent $16.5 million between 1978 and 1980 for research and development and in need of additional funds to complete the project, LearAvia Corp. retained Oppenheimer & Co., Inc. to raise money from private investors. The Lear defendants [1] and Oppenheimer sold partnership units of $150,000 each through a Preliminary Private Placement Memorandum dated April 25, 1980. Prospective investors were required to complete a subscription agreement in which they represented, among other things, that they were able to bear the economic risks of the investment.

LearAvia assigned the rights to all the technology developed with respect to the Lear Fan 2100 to the Partnership; the latter granted Lear Fan Ltd. an option to acquire an exclusive license to all of the Partnership's technology for the purpose of manufacturing and selling the aircraft. In return, Lear Fan Ltd. agreed to pay the Partnership royalties for each Lear Fan 2100 sold during the 25-year period following shipment of the first plane sold, with no monetary cap on total royalty payments.

By the summer of 1982, no aircraft had been developed or sold and additional funds were needed. The Partnership's general partners, Lear Fan Corp. (Nevada) and Lear Fan Corp. (US), entered into a reorganization agreement whereby certain undisclosed investors agreed to contribute $60 million to the project through a shell corporation, Zoysia Corp., N.V. ("Zoysia"). Under the reorganization, Lear Fan Ltd. exercised its option to acquire the exclusive license to the Lear Fan 2100 technology. Lear Fan Ltd. was then acquired by the entity created for the purpose of implementing the refinancing agreements, Fan Holdings, Inc. Zoysia owned 85% of the stock of Fan Holdings, Inc. The Partnership acquired 6% of the stock, the Partnership's royalty rights were restructured according to a formula based on the number of aircraft sold, and royalties were capped at $71,250,000.

Plaintiffs' second amended complaint alleges violations of section 10(b) of the Securities Exchange Act of 1934 [2] and various common law claims with respect to the 1980 private placement and the 1982 reorganization. In particular, counts one and six allege that the Lear defendants, Oppenheimer, and the individual defendants (except Burch) committed common law fraud and violated section 10(b) by making material misstatements and omissions in connection with the 1980 offering of Partnership interests. Counts two, three and four allege that all of the defendants violated section 10(b), breached the Partnership agreement and breached fiduciary duties owed to the Partnership and the limited partners during the 1982 reorganization. Finally, count five alleges that Zoysia, Fan Holdings, Inc. and Burch tortiously interfered with the royalty agreement between the Partnership and Lear Fan Ltd.

A relevant postscript to the commencement of this litigation is that during 1985

---

**1.** LearAvia is the parent corporation of both Lear Fan Ltd. and Lear Fan Corp. Lear Fan Corp. and Lear Fan Corp. (US), a subsidiary of Lear Fan Ltd., were the general partners of the Partnership.

**2.** 15 U.S.C. § 78j.

all four of the Lear defendants filed petitions under Chapter 11 of the Bankruptcy Code: LearAvia and Lear Fan Corp. filed in the District of Colorado and Lear Fan Ltd.[3] and Lear Fan Corp. (US) filed in the District of Nevada. To date, although $200 million has been expended on the Project,[4] no aircraft have been produced or sold and research and development has been suspended.

## THE SETTLEMENT

The parties to the action, the Trustee and Receiver for Lear Fan Ltd., and the Department of Economic Development of Her Majesty's Government of the United Kingdom of Great Britain and Northern Ireland (the "DED") engaged in extensive negotiations to reach a settlement intended to resolve the parties' disputes and continue the project. Under the proposed settlement, a new corporation will be formed—Lear Fan Technology, Inc.—to which the parties and the DED will assign their rights to the Lear Fan 2100, its technology and its profits and royalties, in exchange for stock in the newly formed corporation and the right to appoint its directors. The following table illustrates the share of Lear Fan Technology each party will receive in exchange for its right to the royalties, profits and technology of the project:

| Party | Percentage of LFT Stock Received | Number of Directors | Amount Contributed to Lear Fan Project |
|---|---|---|---|
| LFRLP | 47.00% | 3 | $30 million |
| LEAR FAN LTD. (for its creditors) | 20.00% | 1 | $40 million (approx.) |
| ZOYSIA | 14.25% | 1 | $60 million |
| DED | 14.25% | 1 | $70 million |
| LEAR AVIA | 4.50% | 1 | $16.5 million |

3. Lear Fan Ltd. originally filed for liquidation under Chapter 7. After the Trustee and a Receiver for the company's United Kingdom assets were appointed, the Trustee converted the bankruptcy to one under Chapter 11.

4. Of the $200 million, $30 million was contributed by the Partnership, $60 million by Zoysia, $70 million by the Department of Economic Development of Her Majesty's Government of the United Kingdom of Great Britain and Northern Ireland, $16.5 million by LearAvia, and the balance by others, including creditors of Lear Fan Ltd.

Lear Fan Technology will own 92.8% of the stock of Fan Holdings, Inc. (the owner of all of Lear Fan Ltd.'s stock) and the Partnership will retain its 6% share of Fan Holdings, Inc. All parties and the DED will execute a mutual release with respect to all claims arising out of the sale of the partnership units and the 1982 refinancing.

Pursuant to the stipulation of settlement, the parties have agreed that counts one and six of the second amended complaint will be dismissed without prejudice, the action otherwise certified as a class action for settlement purposes pursuant to Rule 23(b)(1), and counts two through five dismissed with prejudice. After notice was sent by first-class mail to each of the purchasers of limited partnership interests, a hearing on the proposed settlement was held on January 28, 1986.

## EVALUATION OF THE SETTLEMENT

When presented with a proposed settlement of a class action suit, the Court's function is to evaluate the probabilities of success upon a trial and to compare the benefits thereof with the terms of the parties' settlement, not to reopen the negotiations with the litigants or to substitute its business judgment for that of the parties.[5] Where, as here, the parties have negotiated a settlement before the class has been certified, the Court should "scrutinize the fairness of the settlement agreement with even more than the usual care." [6]

We turn first to the likelihood of success on the merits. If the settlement is not approved and the case proceeds to trial,

5. See Kuck v. Berkey Photo, Inc., 87 F.R.D. 75, 78 (S.D.N.Y.1980); Contreras v. Tweedy, Browne & Knapp, 76 F.R.D. 39, 43 (S.D.N.Y.1977); Blank v. Talley Indus., Inc., 64 F.R.D. 125, 129 (S.D.N.Y.1974); Levin v. Mississippi River Corp., 59 F.R.D. 353, 361–62 (S.D.N.Y.), aff'd, 486 F.2d 1398 (2d Cir.), cert. denied, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973).

6. Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).

plaintiffs will have the burden of proof with respect to each of their claims. Without attempting to forecast a definitive resolution upon a trial of the merits, the likelihood that plaintiffs will fail to sustain their burden is substantial.

The limited partners on whose behalf this action is brought, by their own admission, are a group of fairly sophisticated investors, including doctors, lawyers, educators and businessmen. The Prospectus through which the limited partnership units were sold made very clear that it was a risky investment and that the limited partners could lose their entire investment. In fact, the first sentence of the first paragraph of the introduction to the Prospectus cautioned: "Investment in the Limited Partnership Interests involves a high degree of risk." Moreover, the Prospectus made clear that "[t]here can be no assurance that Limited will manufacture and sell airplanes or that royalties to the partnership with respect thereto will ever be paid." The Prospectus disclosed the risks associated with the production of an aircraft still in the developmental stage, the need for FAA approval of the airplane, and emphasized that the project might be unable to obtain the funding necessary to complete development of the aircraft.

■ The explicit disclosures by defendants of the multitude of risks associated with the venture make it far from certain that plaintiffs would be able to establish that the defendants intentionally misled the investors or that plaintiffs reasonably relied on any representations about the project's future, two elements of their section 10(b) and common law fraud claims.[7] Defendants could argue that the various projections in the Prospectus challenged by plaintiffs are not actionable since the defendants had a reasonable basis to make such statements in view of the facts known at the time they were made. In addition,

the detail with which the Prospectus described potential conflicts of interest and other matters casts substantial doubt on the viability of plaintiffs' claim that there were material omissions with respect to these matters. Plaintiff's claims regarding the 1980 sale of limited partnership interests is further weakened by the fact that each investor was required to represent in writing that he or she had read the Prospectus, knew the venture was speculative and was willing and able to bear the risk of the loss of the entire investment.[8]

With respect to plaintiffs' claims regarding the 1982 refinancing, plaintiffs' major hurdle to recovery is that plaintiffs are seeking recoupment of the amount of royalties they would have received if the royalties provision had not been renegotiated. Since no aircraft have been sold, no royalties have been paid in any amount. The Lear Fan 2100 has not received FAA certification and research and development has been suspended. As a result, plaintiffs' claim that they were damaged by the royalty reduction in 1982 appears conjectural and is extremely unlikely to prevail. Moreover, since the ability of plaintiffs to receive any royalty payments was tied directly to the project's success, the decision of the general partners to reduce plaintiffs' royalty share in exchange for $90 million of additional funding probably would be considered a direct benefit to the limited partners and a decision entitled to protection under the business judgment rule.

■ Even if plaintiffs prevailed on any or all of their claims, the likelihood of recovering substantial damages from the defendants is complicated by the bankruptcy of all four Lear defendants and by the insolvency of both Zoysia and Fan Holdings, Inc. In addition, the limited partners already have received most, if not all, of their expected tax benefits from their in-

7. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); Freschi v. Grand Coal Venture, 767 F.2d 1041 (2d Cir.1985); Ainger v. Michigan General Corp., 476 F.Supp. 1209 (S.D.N.Y.1979), aff'd, 632 F.2d 1025 (2d Cir. 1980).

8. Cf. Zissu v. Bear Stearns & Co., 627 F.Supp. 687 (S.D.N.Y.1986).

vestment in the project. Under the decision of our Court of Appeals in *Salcer, Panfeld, Edelman v. Envicon Equities Corp.*,[9] damages in federal securities suits must be offset by the tax benefits received by the investor, thereby significantly reducing the amount of provable damages plaintiffs could recover upon a trial.

If the settlement is not approved, the protracted and costly litigation will continue. Defendants have indicated that they will not only move to dismiss the complaint but will also oppose class certification. Discovery, which already consists of numerous depositions and inspection of thousands of pages of documents, would no doubt continue until the moment of trial. The complexity of the 1982 refinancing transaction, the fact that six years have passed since the 1980 private placement, and the likelihood of appeals should the plaintiffs prevail all increase the uncertainty surrounding plaintiffs' ability to obtain a result more favorable than this settlement.

The proposed settlement is the product of extensive and thorough arms-length negotiations conducted in good faith by experienced counsel over a period of seven months. They included not only the parties but also counsel for the DED. The settlement offers the plaintiffs the prospect of sharing the profits from a viable new corporation. Each party and the DED has rights to different portions of the technology which alone are essentially worthless. If combined through this settlement, a potentially valuable entity can be created. With all of the claims to the Lear Fan 2100 technology resolved, Lear Fan Technology, Inc. will have an opportunity to attract new financing to complete the aircraft. If the settlement is not approved, the parties and the DED will lose their $200 million expenditure.

The limited partners, who contributed only $30 million of the $200 million expended to date, will receive 47% of the stock of the new corporation and the right to appoint three of its directors. While Lear Fan Technology, Inc. may not achieve the degree of success hoped for by the parties, the Court is of the view that the possibility of substantial profits from the sale of the aircraft or sale of the new corporation far outweigh the marginal likelihood that plaintiffs would prevail at trial, succeed in recovering damages, or that any assets would be available to satisfy all or any part of a recovery.

Bearing in mind its responsibility independently to evaluate the proposed settlement, the Court notes that the Bankruptcy Courts for the Districts of Nevada and Colorado have approved the settlement with respect to the four Lear defendants and that no limited partners have filed any objections to the proposed settlement.

After a careful weighing of all of the competing considerations, the Court approves the proposed settlement.

## ATTORNEYS' FEES

Applying the factors enumerated in *City of Detroit v. Grinnell Corp.*,[10] and upon consideration of the affidavits of plaintiffs' counsel detailing the information as to the services they rendered, the Court is of the view that the amount and apportionment of fees and disbursements agreed upon by the parties is fair and reasonable and, accordingly, is approved.

Judgment may be entered accordingly.

So ordered.

---

**9.** 744 F.2d 935 (2d Cir.1984).

**10.** 495 F.2d 448 (2d Cir.1974).