Averill H. FISK, Plaintiff,

v.

SUPERANNUITIES, INC.,
et al., Defendants.

No. 95 Civ. 6664 (LAK).

United States District Court,
S.D. New York.

June 10, 1996.

Eric Wertheim, Law Offices of Andrew D. Zeif, New York City, for Plaintiff.

Jonathan M. Herman, Bruce A. Schoenberg, Dorsey & Whitney, P.L.L.P., New York City, for Defendants Thomas Wartenberg and David L. Dirks.

A. Joseph Tandet, New York City, for Defendants Raymond L. Dirks and Nolan K. Bushnell.

Arnold S. Schickler, Schickler & Schickler, New York City, for Defendant Lory E. Roston.

## OPINION

KAPLAN, District Judge.

Plaintiff purchased 50,000 shares of a start-up company, defendant SuperAnnuities, Inc. ("SuperAnnuities"), for $100,000. SuperAnnuities failed, and plaintiff now seeks damages against it and four of its former directors pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5 (1995), and Section 12(2) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77l (2), and on common law theories. Plaintiff claims that he was defrauded because the prospectus (1) did not disclose that SuperAnnuities would dilute the book value of its shares by issuing stock in exchange for the services of comedians who would pitch its products, (2) falsely stated that the officers and directors would not be compensated for their services in selling SuperAnnuities' shares, and (3) failed to disclose other "suspicious facts." He asserts in addition that he was induced to buy shares in part by an alleged oral promise by SuperAnnuities' chief executive officer that the promisor never had any intention of keeping.

The individual defendants move to dismiss pursuant to FED.R.CIV.P. 9(b) and 12(b)(6).

### Facts

The Court accepts the well pleaded factual allegations of the complaint and the reasonable inferences therefrom as true for purposes of this motion. Inasmuch as the complaint refers extensively to, and bases its claims upon the contents of, SuperAnnuities' Confidential Private Placement Memorandum (the "PPM") and its 1994 financial statements, those documents also are properly considered on this motion. *E.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808–09 (2d Cir.1996).

In early 1994, SuperAnnuities was a start-up venture. It planned to sell annuities and other complex insurance products through the use of "infomercials" featuring well-known comedians. (Cpt ¶¶ 13, 14, 19(b)) Its founder and chief executive officer was defendant Raymond L. Dirks. (*Id.* ¶ 12)

In or about February 1994, SuperAnnuities was conducting an offering of up to four million shares of common stock. (*Id.*) At about that time, plaintiff was introduced to Dirks, who asked plaintiff to purchase shares. Dirks allegedly told plaintiff that the proceeds of the offering would be used principally to start operations and conduct test marketing and that the company would finance further operations through a subsequent public offering for which it supposedly had a firm underwriting commitment. (*Id.* ¶¶ 14–15) Plaintiff was interested, but initially not at the $2 asking price. Dirks, however, allegedly promised that if plaintiff bought 50,000 shares for $2 per share, Dirks would have plaintiff placed on SuperAnnuities' board of directors and plaintiff then would receive an additional 50,000 shares for nominal or no additional consideration. (*Id.* ¶¶ 16–17)

### The PPM

At about the same time, plaintiff received the PPM and an Executive Summary. Insofar as is relevant to plaintiff's claims, the PPM made the following statements:

### Dilution

In the Use of Proceeds section of the PPM and in the summary thereof, SuperAnnuities indicated that it intended to use the proceeds of the offering for preliminary marketing efforts, including the preparation and production of preliminary infomercials. (PPM, Herman Aff. Ex. A (hereinafter "PPM"), at 3–4, 11) The PPM further indicated that the

company expected that the net proceeds of the offering would satisfy its financing needs for six to twelve months, depending upon the amount of proceeds, and warned in another section that SuperAnnuities would be "wholly-dependent upon the net proceeds of this offering to initiate operations." (*Id.* at 11, 6) Nevertheless, it specifically cautioned:

"The allocation of net proceeds of this offering set forth above represents the Company's best estimates based upon its present plans, certain assumptions regarding general economic and industry conditions and the state of its business plan. If any of these factors change, the Company may find it necessary or advisable to reallocate some of the proceeds within the above described categories or to use portions thereof." (*Id.* at 11)

The PPM went on to describe the anticipated role of the comedians in the company. It indicated that SuperAnnuities would establish an Advisory Board of well known comedians to advise it on various matters. The members of the Advisory Board would be eligible to participate in an Advisory Board Stock Purchase Plan, which set aside two million shares of common stock for purchase by them at prices to be fixed by the board of directors. (*Id.* at 21–22) The PPM disclosed also that members of the Advisory Board were expected to render other services to the company, such as appearing in infomercials, for which they would be compensated. (*Id.* at 22) It did not indicate whether such compensation was expected to be in the form of cash, stock or other consideration.

### Compensation for Sale of Shares

Plaintiff alleges that the PPM represented that officers and directors of SuperAnnuities were not to be compensated for the sale of shares, but that Dirks and his wife, nevertheless, were paid $190,500 in commissions. (Cpt ¶ 37–38) He contends that the PPM's statement concerning sales compensation either was false or misleading. (*Id.* ¶¶ 37, 39)

The summary at the beginning of the PPM stated that:

1. Presumably, the word "licensed" meant "regis-

"The Shares will be offered by executive officers and directors of the Company who will receive no compensation for the sale of these securities. The Company, however, reserves the right to sell Shares through any licensed broker/dealers that are members of the National Association of Securities Dealers, Inc. ('NASD') and to pay such broker/dealers a ten percent cash commission for Shares sold by them." (PPM. at 3)

Elsewhere, it stated that Dirks was the founder of a firm that was "a division of RAS Securities Corp., a New York-based investment banking firm." (*Id.* at 18) Nowhere did it indicate that RAS Securities Corp. was a licensed broker-dealer.[1]

### Subsequent Events

Plaintiff purchased 50,000 shares of SuperAnnuities common stock on or about February 17, 1994. (Cpt ¶ 27)

On or about September 1, 1994, plaintiff received the company's financial statements for the period August 23, 1993 through June 30, 1994, a notice of annual meeting, and a proxy statement. (*Id.* ¶ 28) These are said to have alerted plaintiff to the defendants' alleged fraud. (*Id.* ¶ 29)

First, the proxy statement showed that plaintiff had not been nominated for election to the board of directors. (*Id.* ¶¶ 42–43)

Second, the financial statements supposedly showed that 3,440,000 shares were issued to individuals in lieu of cash for services, thus supposedly exposing the falsity of the alleged representations of how the comedians would be paid for their services and the failure to disclose the likelihood or certainty of substantial dilution. (*Id.* ¶¶ 30–36)

Third, these documents show that defendant Wartenberg, president of SuperAnnuities, was paid $18,000 for rent and that the company bought two million shares from Dirks on August 1, 1994 for ten cents per share, self-dealing transactions that allegedly were not disclosed in the PPM. (*Id.* ¶¶ 46–49)

On November 10, 1994, SuperAnnuities issued a letter to shareholders indicating that

tered."

it had failed to obtain additional financing, had voted to cease operations, and expected that shareholders would receive no significant benefit from the company's remaining assets. (*Id.* ¶ 53)

### Discussion

Defendants argue that the entire complaint should be dismissed. They contend that the facts plaintiff claims were misrepresented or concealed actually were disclosed and, in any case, that plaintiff has failed to allege fraud with the particularity required by FED. R.CIV.P. 9(b) or the requisite loss causation. They argue also that the Rule 10b–5 claims are time barred, that the Section 12(2) count does not state a claim upon which relief may be granted, and that plaintiff's self-dealing and mismanagement theories do not state federal claims for relief and must be pursued, if at all, derivatively. Finally, each defendant contends that the complaint does not allege facts sufficient to connect him or her to any actionable misconduct.

### Disclosure Issues

The disclosure claims involve three contentions: the alleged nondisclosure of the intention to "give away" stock to comedians in exchange for services, the alleged misrepresentation that insiders would not be paid for selling stock, and Dirks' allegedly fraudulent promise to put plaintiff on the board. The first point of departure, therefore, is to determine whether in fact there was an arguably material misstatement or omission.

### The Alleged Stock "Give Away"

 Plaintiff's principal fire is based on the allegation that SuperAnnuities planned at the time of the offering to give stock to comedians in exchange for their services, that this would have a substantial dilutive effect on the common stock, and that this should have been disclosed in the PPM. He contends that this plan must have existed at the time of the offering because (1) the June 30, 1994 financial statements showed that 3,440,000 shares had been issued in exchange for services by that date, which was close in time to the period of the offering, (2) the executive summary plaintiff received in February 1994 referred to preliminary relationships with some comedians which, plaintiff assumes, must have embraced stock for services arrangements, and (3) SuperAnnuities' subsequent disclosures did not suggest that the issuance of stock for services had been a departure from its original business plan. (Cpt ¶¶ 33–36) Plaintiff's position is without merit, even viewing the complaint, as the Court does, in the light most favorable to the plaintiff.

To begin with, plaintiff's major premise is that the 1994 financial statements revealed that 3,440,000 shares were issued as compensation for services between the date of the offering and June 30, 1994. From this premise, plaintiff would have a trier of fact conclude that there was a plan to issue these shares at the time of the offering and that the plan should have been disclosed. But the premise is demonstrably wrong.

The complaint asserts that the 3,440,000 share figure comes from the 1994 financial statements. (Cpt ¶ 30) True, the financial statements stated that the company had issued 4,440,000 shares in lieu of compensation for services during the period August 23, 1993 through June 30, 1994. (Hermann Aff. Ex. B, at 4, 7) But putting the discrepancy between 3,440,000 and 4,440,000 aside [2] and giving plaintiff the benefit of the doubt, he simply misunderstands the financial statements.

The capitalization table in the PPM showed that there were 6,285,000 shares outstanding at November 30, 1993. (PPM at 12) The balance sheet as of June 30, 1994 showed that there were 9,913,000 outstanding as of that date. (Herman Aff. Ex. B, at 4). Thus, 3,628,000 shares were issued between November 30, 1993 and June 30, 1994. The June 30, 1994 balance sheet further shows that 2,223,000 shares had been issued in the offering and 250,000 shares in satisfaction of a preexisting debt. (*Id.* at 4, 12) Thus, no more than 1,155,000 shares (i.e., 3,628,000 less the 2,473,000 issued in the offering and in satisfaction of debt) could have been issued in lieu of compensation for services

---

**2.** *See infra* note 3.

between November 30, 1993 and June 30, 1994.[3]

The fact that the complaint overstates by a factor of three the number of shares issued in lieu of compensation after November 30, 1993 is not a complete answer to plaintiff's position. He contends that the PPM led him to believe that there was no risk of dilution through the issuance of shares below net tangible book value, a suggestion that would have been false if a plan existed to issue shares in that manner. There are two fatal problems with the argument. First, the PPM said no such thing and, indeed, indicated that dilution by the issuance of stock to comedians was a real possibility. Second, the issuance of shares in exchange for services need not be dilutive.

As indicated above, the PPM disclosed that two million shares had been reserved for issuance to comedians who joined the Advisory Board at prices to be determined by the board of directors. As nothing in the PPM indicated that the board would issue such shares only at prices at or above the net tangible book value of the stock, the PPM fairly disclosed the existence of a substantial risk of dilution through the issuance of a very substantial quantity of additional shares at bargain prices.

To be sure, there is a distinction, as plaintiff contends, between what he characterizes as a "give away" and the issuance of shares at low prices. There is a distinction also between issuing shares to members of an Advisory Board, who would be compensated separately for other services, and issuing shares to non-Advisory Board members in exchange for services. But in this context, these are distinctions without a difference.

Even assuming that the PPM was misleading in failing to disclose a plan to issue shares in lieu of compensation, it was not materially so in this context.

The test of materiality is whether " 'there is a substantial likelihood that a reasonable shareholder would consider [the misstatement or omission] important in deciding how to vote.' " *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090, 111 S.Ct. 2749, 2756, 115 L.Ed.2d 929 (1991) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *United Paperworkers International Union v. International Paper Co.*, 985 F.2d 1190, 1198 (2d Cir.1993). In the case of omissions, the issue is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132.

Here, plaintiff's grievance is that the lack of disclosure of an alleged intention to give stock to comedians in exchange for services failed to alert him to a risk of substantial dilution. The PPM, however, explicitly told prospective investors that two million shares were reserved for issuance to comedians at prices fixed in the discretion of the board, which of course could have been set at levels that would have made the issuance dilutive. Thus, plaintiff was alerted to the risk of substantial dilution that he claims was concealed. While he complains of stock dilution from the issuance of shares for services, a reason for issuing the shares somewhat different from that discussed in the PPM, the complaint makes clear that it was the risk of

---

**3.** The balance of the 4,440,000 shares issued in exchange for services thus were issued between August 23, 1993 and November 30, 1994—and therefore well before plaintiff purchased shares in the offering.

After the motion was briefed, plaintiff's counsel by letter advised the court that the 1994 financial statements submitted in support of defendants' motion were not exactly the same as those received by plaintiff and referred to in the complaint and furnished a copy of those statements. (Letter to the Court from Andrew Zeif, Esq., dated Jan. 22, 1996 & Ex. 1) The statements submitted by plaintiff differ in only two relevant

respects. First, they show that four million shares had been sold to founders for one cent per share and that 3,440,000 shares had been issued in exchange for services, whereas the statements submitted defendants showed three million and 4,440,000 shares issued for those purposes, respectively. Second, the newly proffered statements show the sale of 250,000 shares to a qualified investor at $1.40 per share, whereas those proffered by the defendants characterize that transaction as the issuance of stock in extinguishment of a debt at $1.40 per share. These differences do not affect the analysis in the text.

dilution that was important to plaintiff, not the reason for the dilutive issuance of shares. There is no meaningful likelihood that any reasonable investor would have regarded disclosure of the fact that SuperAnnuities allegedly intended to issue stock to comedians for services other than participation on the Advisory Board as significantly altering the total mix of available information. Accordingly, the alleged failure to disclose was not material as a matter of law.[4]

What has been said thus far is entirely sufficient to dispose of this contention. But, as noted, plaintiff's contention lacks merit for another reason. The complaint presupposes that the issuance of stock in exchange for services necessarily is dilutive. (*See* Cpt ¶¶ 30–31) That simply is not so. If the fair value of services received in exchange for newly issued stock equals or exceeds the net tangible book value of the shares issued, there is no dilution, assuming of course that the issuer otherwise would have acquired the services for their fair market value and paid, or promised to pay, in cash or other tangible assets. As the complaint does not allege that the value of the services received was less than the net tangible book value of the shares allegedly issued in exchange, it would fail to state a claim upon which relief may be granted even if the PPM had not disclosed the intent to issue up to two million shares to Advisory Board members at potentially dilutive prices.

*Compensation for Sale of Shares*

■ Plaintiff is on much firmer ground in contending that the PPM misled him as to Dirks' eligibility to receive commissions for selling shares in the offering. As indicated, the introductory summary of the PPM unequivocally stated that the shares would be sold by the officers and directors, who would not be compensated for such services, although the company reserved the right to sell through licensed broker-dealers, who would be paid a commission of ten percent. Anyone reading that summary would have been justified in coming away with the impression that the sales effort would be made primarily or exclusively by insiders and that insiders would not receive commissions. Dirks and his wife, however, allegedly received commissions of $190,500. (Cpt ¶ 38) Since the entire offering brought in only $3,872,052 (Herman Aff. Ex. B, at 5), it appears that Dirks and his wife were paid commissions on fully half the sales, assuming that the commissions they received were at the ten percent rate stated to have been payable to licensed broker-dealers.

Defendants hang their hats on three pegs in the PPM in their effort to obtain dismissal of this claim on the basis that there was adequate disclosure. First, they note that the PPM disclosed that the company might use the services of licensed broker-dealers, who would receive commissions. (PPM at 3, 27) Second, they point out that Dirks was described elsewhere in the PPM as the founder of a division of RAS Securities Corp., which was characterized as an investment banking firm. (PPM at 18) Third, they note that the description of the terms of the offering at page 27 of the PPM said that the shares would be sold through the efforts of the officers and directors, who would "not be compensated for their services *as such*" (emphasis added)—a qualification that does not appear in the summary at page 3. Accordingly, they argue that plaintiff was told in substance that the company might sell through licensed broker-dealers, that Dirks was affiliated with a licensed broker-dealer, and that he might receive commissions in that capacity even though he would not be paid commissions as an officer or director. Any ambiguity, they contend, is chargeable to plaintiff because he never questioned the company. The argument is sophistry.

To begin with, defendants would be entitled to dismissal of this claim only if the plaintiff would be entitled to no relief, accepting the well-pleaded factual allegations of the complaint as true and drawing all reasonable inferences in his favor. *Conley v. Gibson,*

---

**4.** Materiality is a mixed question of law and fact and often is incapable of resolution on a dispositive motion. Where, however, no reasonable trier of fact could conclude that the information in question is material, resolution on a motion to dismiss or for summary judgment is appropriate. *E.g., Feinman v. Dean Witter Reynolds, Inc.,* 84 F.3d 539, 540 (2d Cir.1996); *L.L. Capital Partners, L.P. v. Rockefeller Center Properties, Inc.,* 921 F.Supp. 1174, 1183 (S.D.N.Y.1996).

355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). A trier of fact certainly would be justified in concluding that the PPM suggested that officers and directors would not be compensated for sales efforts. At least on this limited record, it would be justified in concluding that the addition of the words "as such" on page 27 did not raise a warning flag sufficient to put a reasonable investor on notice requiring inquiry, particularly in view of the fact that the statement reasonably might be regarded as "buried." *See generally* 2 ALAN R. BROMBERG & LEWIS D. LOWENFELS, BROMBERG AND LOWENFELS ON SECURITIES FRAUD & COMMODITIES FRAUD (hereinafter "BROMBERG") § 6.5(414)(9) (2d ed.1995) (collecting cases). It would be justified too in concluding from the fact that Dirks and his wife received commissions on half of .the entire offering that they knew during the offering they would be compensated for those efforts but concealed that information. Hence, even if the PPM had disclosed that Dirks and his wife were affiliated with a licensed broker-dealer, a trier might well conclude that investors were deceived deliberately. But the PPM did not do even that.

The unstated assumption of defendants' argument is that the statement that Dirks was the founder of a division of an investment banking firm is equivalent to saying that he was affiliated with a licensed (i.e., registered) broker dealer. That is not so. A firm is required to register as a broker-dealer under the Exchange Act only if it engages in securities transactions, or seeks to induce the purchase or sale of securities, using the mails or means and instrumentalities of interstate commerce. *See* 15 U.S.C. § 78o. While many core activities of traditional, full service investment banking firms—such as underwriting—require them to register, there are smaller firms that characterize themselves as investment banks whose activities are narrower and who find it neither necessary nor desirable to register. In any case, the complaint does not exclude that possibility. Hence, reading the complaint in the light most favorable to the plaintiff, the mere characterization of Dirks' firm as an investment bank cannot be taken as equivalent to stating that it was a registered

broker-dealer even as a matter of law. And even if it were, there would be no reason to assume that prospective investors would have sufficient knowledge of registration requirements and the nature of the investment banking business to be chargeable with awareness of such a fact. Accordingly, insofar as defendants seek dismissal of the claim relating to nondisclosure of sales commissions to Dirks on the ground that the information in fact was disclosed, the motion is denied.

### Appointment to the Board

■ Plaintiff claims that Dirks lied to him when he promised to have plaintiff appointed to the SuperAnnuities board of directors in exchange for plaintiff purchasing 50,000 shares at $2 per share. A person who promises to perform specific acts in the future, while secretly not intending to perform, violates Rule 10b–5 if the promise was made in consideration for the purchase of securities and the other elements of the cause of action are satisfied. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993); *Luce v. Edelstein*, 802 F.2d 49, 56 n. 3 (2d Cir. 1986). Accordingly, plaintiff's claim that Dirks lied to him about the board seat to induce him to buy the shares adequately alleged a material misstatement in connection with his purchase.

### Rule 9(b)

Rule 9(b) requires that averments of fraud be made with particularity. It manifestly applies to the Rule 10b–5 and common law fraud claims. And while fraudulent intent is not an essential element of a claim under Section 12(2) of the Securities Act, plaintiff has incorporated his allegations of fraud into the Section 12(2) claim (Cpt ¶ 71), thus making the Rule 9(b) applicable to that claim as well. *L.L. Capital Partners, L.P.*, 921 F.Supp. at 1183; *Neubauer v. Eva–Health USA, Inc.*, 158 F.R.D. 281, 284 n. 1 (S.D.N.Y. 1994) (collecting cases).

■ In this Circuit, a securities fraud plaintiff must "allege facts that give rise to a strong inference of fraudulent intent" in order to state a legally sufficient claim for relief. *Shields v. Citytrust Bancorp, Inc.*, 25

F.3d 1124, 1128 (2d Cir.1994). This may be accomplished "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id. Accord, e.g., San Leandro Emergency Medical Group Profit Sharing Plan,* 75 F.3d at 813; *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51–52 (2d Cir.1995); *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 268–69 (2d Cir.1993).

■ Here, the facts alleged constitute strong circumstantial evidence of conscious misbehavior or recklessness on the part of Dirks in connection with the allegedly inadequate disclosure of the fact that he and his wife would receive sales commissions. Dirks obviously was the prime mover in this enterprise. He was the chairman and chief executive officer of SuperAnnuities. The PPM indicated that the shares would be sold by the officers and directors, a group including Dirks. The indication that the officers and directors would not be paid for their services in selling shares, a trier could find, was designed to create the impression that the company would receive the full benefit of all capital raised by the offering. The reservation of the right to pay commissions to licensed broker-dealers, Dirks arguably knew, served as a fig leave that could be used to justify payments to Dirks and the firm with which he was connected. And while the average investor was not chargeable with knowledge that the firm with which Dirks was affiliated was a registered broker-dealer, Dirks quite likely would have known that. Moreover, the inclusion of the words "as such" on page 27 of the PPM, which is described above, could well be found to constitute evidence that Dirks was trying to preserve a means of paying himself commissions while creating the impression that no commissions would be paid to insiders. Accordingly, there is no basis for dismissing this aspect of the complaint as against Dirks.

■ The claim that Dirks falsely promised to put plaintiff on the board is another matter. Plaintiff alleges two facts that, singly and in combination, are insufficient to raise a strong inference of fraudulent intent on the part of Dirks in making the alleged promise. First, the proxy statement—which plaintiff received approximately seven months after the alleged promise (*see* Cpt ¶ 11, 17, 28)—revealed that plaintiff was not nominated for a position on the board of directors and that Dirks had agreed to vote for nine other proposed nominees. (*Id.* ¶ 42) Second, in response to repeated inquiries by and demands from plaintiff regarding the failure to follow through on the promise, Dirks remained silent, neither denying that the promise was made nor offering an explanation for the failure to attempt to have plaintiff placed on the board. (*Id.* ¶ 43)

The simple fact of nonperformance of a promise is insufficient to raise an inference of fraud. If it were, every breach of contract and promissory estoppel claim could be asserted, in the alternative, as a claim of fraud. *See, e.g., Mills,* 12 F.3d at 1176; *Carlucci v. Owens–Corning Fiberglas Corp.,* 646 F.Supp. 1486, 1491 (E.D.N.Y.1986) (collecting cases). Here, plaintiff's discovery that Dirks did not put him on the board slate sheds no light on Dirks' intent at the time Dirks allegedly made the promise, seven months earlier. Dirks' alleged silence when confronted by plaintiff is susceptible to a variety of interpretations and falls short of what is required to turn a broken promise into a fraud claim. Accordingly, this claim must be dismissed.

■ The remaining defendants argue that the complaint does not allege facts sufficient to connect them to any misstatements or omissions in the PPM and thus runs afoul of Rule 9(b). To be sure, Rule 9(b) requires that each of multiple defendants be informed "of the nature of his alleged participation in the fraud," *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987), and that "the complaint . . . allege facts giving rise to a strong inference of the defendant's culpable state of mind," *Neubauer,* 158 F.R.D. at 283 (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 776 (2d Cir.1991) and *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172–73 (2d Cir.1990)). It is equally clear, however, that there is no need for the plaintiff to connect particular insiders participating in a securities offering—as distinguished from outside directors,

lawyers, accountants and others—to misstatements in an offering memorandum. *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990); *DiVittorio,* 822 F.2d at 1247; *Luce,* 802 F.2d at 55; *Neubauer,* 158 F.R.D. at 283. Here, all of the individual defendants are alleged to have been both executive officers and directors of SuperAnnuities "at all relevant times." (Cpt ¶¶ 6–10) The PPM made clear that the securities would "be offered by executive officers and directors of the Company." (PPM 3) In consequence, the complaint is sufficient to link each of them to the contents of the PPM.[5]

*Statute of Limitations*

■ A claim under Rule 10b–5 is timely only if it is commenced within one year after actual or constructive discovery of the alleged violation *and* within three years of the alleged violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 359–60, 111 S.Ct. 2773, 2780, 115 L.Ed.2d 321 (1991). Plaintiff purchased his SuperAnnuities shares on or about February 17, 1994 and commenced this action on August 21, 1995. In consequence, the action satisfies the three year period of repose. Defendants nevertheless argue that plaintiff's Rule 10b–5 claims are barred because they were not brought within one year of the date on which, in the exercise of reasonable diligence, he should have discovered the alleged fraud.

The crux of defendants' argument is that inconsistencies in the PPM were sufficient to put plaintiff on inquiry notice. Had he been reasonably diligent, they argue, he would have discovered the facts that he now claims were omitted from the PPM. (Wartenberg Mem. 14–15) They rely on *In re Integrated Resources Real Estate Limited Partnerships Securities Litigation,* 850 F.Supp. 1105, 1119 (S.D.N.Y.1993).

Whatever the merits of defendants' argument in other circumstances, there is nothing of substance to it as applied to the lone disclosure claim that otherwise survives defendants' motion to dismiss. Plaintiff's remaining grievance is that the PPM falsely represented that insiders would sell the shares in the offering and would not be compensated for doing so, when in truth Dirks was to be, and in fact was, paid substantial commissions for his efforts. For reasons previously expressed, there was nothing in the PPM that should have put a reasonable investor on notice of any possibility that Dirks would receive commissions. At a minimum, defendants certainly have failed to establish that a trier of fact would be obliged to conclude that the PPM would have done so. In consequence, defendants' motion to dismiss the remaining Rule 10b–5 claim as untimely is denied.

*Loss Causation*

■ In this Circuit, a Rule 10b–5 plaintiff must establish both transaction and loss causation.[6] *E.g., Wilson v. Ruffa & Hanover,*

---

**5.** Defendants argue that "a plaintiff may not rely exclusively upon wholly conclusory allegations of insider status." (Wartenberg Mem. 20) To be sure, a conclusory allegation that an individual defendant is an "insider" or controlling person is insufficient to trigger the relaxed standard articulated in *Luce.* Here, however, the complaint specifically alleges the particular corporate offices and directorships held. No more is required.

Nor is defendants' position buttressed by cases in which the relaxed pleading standard for insider defendants was found inapplicable or not satisfied for various reasons not at issue here. *See, e.g., Mills,* 12 F.3d at 1175 (alleged fraudulent statements in connection with *employment contracts* must be attributable to specific defendants; implicit in this holding was the assumption that an insider's knowledge and participation may be imputed less easily with respect to employment contract than to the contents of an offering mem-

orandum); *Crossen v. Bernstein,* No. 91 Civ. 3501 (PKL), 1994 WL 281881 at *8–*9, Fed, Sec. L.Rep.P. 98,329 (S.D.N.Y. June 23, 1994) (insufficient pleading with particularity where alleged misrepresentations were not specifically attributed to offering letter, financial projections, unspecified verbal communications, or other source, and the complaint failed to distinguish the roles of multiple defendant entities and their officers or directors); *O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 226 & n. 6 (same).

**6.** These requirements seem perfectly appropriate in light of Section 28(a) of the Exchange Act, 15 U.S.C. § 78bb(a), which limits damage recoveries in actions under that statute to "actual damages on account of the act complained of." *See* 3 BROMBERG § 8.7(1).

*P.C.*, 844 F.2d 81, 86 (2d Cir.1988), *vacated on reargument and aff'd*, 872 F.2d 1124 (2d Cir.1989). Transaction causation is established by "allegations and proof that the transaction in question would not have occurred 'but for' the misstatement." *Id.* Loss causation, on the other hand, requires proof of "a 'direct and proximate relationship between the loss and the misrepresentation,'" and it may not be supplied by "but for" allegations. *Id.* (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985)). It is at least analogous to proximate cause. *See Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir.1992); *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.*, 801 F.2d 13, 20–21 (2d Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

In this case, plaintiff alleges that he would not have purchased stock in SuperAnnuities but for the misrepresentations and omissions complained of. There is no suggestion, however, that the loss he ultimately sustained, which flowed from the collapse of the company, was caused by or a proximate consequence of the payment of commissions to Dirks and his wife. Defendants therefore contend that plaintiff's federal securities law claims should be dismissed.

■ The Court agrees, but only to a point. Defendants are correct in asserting that the complaint does not sufficiently allege loss causation. Nor could it. The 1994 financial statements show that the company had revenue in fiscal 1994 of only $10,755 as against expenses of more than $2.5 million. (Herman Aff. Ex. B, at 3) In such a scene of financial devastation, no reasonable trier of fact could conclude that $190,000 more or less would have made any difference or, indeed, that it would have been a significant factor contributing to the company's demise. Accordingly, defendants are entitled to dis-missal of the Rule 10b–5 claim for failure to allege loss causation.

■ The Section 12(2) claim is another matter. Under the law of this Circuit during the time period governing this action, loss causation was not an element of a Section 12(2) claim, which imposed strict liability for material misrepresentations made by statutory sellers.[7] *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1125–27 (2d Cir.1989); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir.1988); *Polycast Technology Corp. v. Uniroyal Inc.*, 792 F.Supp. 244, 259 (S.D.N.Y.1992). Defendants' papers do not argue that the allegations are insufficient to establish their status as statutory sellers. Accordingly, defendants' motion to dismiss for failure to allege loss causation is denied insofar as it relates to the Section 12(2) claim.

*The Section 12(2) Claim*

■ Defendants contend that the Section 12(2) claim must be dismissed in light of *Gustafson v. Alloyd Co.*, ⸺ U.S. ⸺, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). They are mistaken, at least at this stage of the litigation.

Section 12(2) creates a cause of action against one who sells securities "by means of a prospectus or oral communication" containing a materially false or misleading statement. *Gustafson* said that the word "prospectus" in Section 12(2) "is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholders" and held, in consequence, that misrepresentation in a private sale of stock was not subject to Section 12(2) because the contract of sale was not a prospectus. *Id.* ⸺⸺⸺, 115 S.Ct. at 1073–74. Defendants seize upon the fact that plaintiff's purchase in this case was made pursuant to a private placement memorandum to contend that there was no public

---

7. Congress subsequently amended Section 12(2) to permit a defendant to plead an affirmative defense of loss causation but stated that the amendment should not affect any action commenced before and pending on the date of the amendment. Pub.L. 104–67 §§ 105, 108 (codified in 15 U.S.C. § 77*l* (b)); *see also* 1 1995 U.S.C.C.A.N. (109 Stat. 757, 758); 2 1995 U.S.C.C.A.N. at 702 (Senate Report explaining purpose of amendment to Section 12(2) and explicitly criticizing *Wilson v. Saintine Exploration Drilling Corp.*, 872 F.2d 1124, 1126 (1989)). This action was filed on August 21, 1995, approximately four months prior to the effective date of the amendment, December 22, 1995.

offering here and therefore that Section 12(2) is inapplicable.

Despite some broad language, the Supreme Court in *Gustafson* held only that the stock purchase contract at issue was not a prospectus because it "was not required to contain the information contained in a registration statement and ... no statutory exemption was required to take the document out of § 10's coverage." *Id.* at ——, 115 S.Ct. at 1067. The Court thus implied that a material misstatement or omission in a document that, but for a statutory exemption, would be required to contain the information contained in a registration statement would be a Section 10 prospectus and therefore subject to Section 12(2). Weiss, *Securities Act Section 12(2) After* Gustafson v. Alloyd Co.: *What Questions Remain?* 50 BUS.LAW. 1209, 1219–20 (1995).

In this case, the PPM recited that it "constitute[d] an offer only to the person to whom [it was] delivered and only if such person is an accredited investor as such term is defined in Rule 501(a) of Regulation D ..." (PPM at i) Moreover, the subscription agreement contained in the PPM required the prospective purchaser to represent that he or she was an "accredited investor" (PPM Ex. B, § 1.4), to acknowledge that the offering was intended by the company to be exempt from registration both under Section 4(2) of the Securities Act and Regulation D (*id.* ¶ 1.8), and to represent that he or she had been given all desired information about the company and an opportunity to ask and receive answers to any questions he or she might have had (*id.* ¶ 1.7). In consequence, the offering on its face was structured to come within Section 4(2), the private placement exemption to the Securities Act registration requirements, codified at 15 U.S.C. § 77d, as amended. *See, e.g., SEC v. Ralston Purina Co.,* 346 U.S. 119, 126–27, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953).

There remains plaintiff's contention that the limited information thus far available to him casts doubt on "whether the offering was a *bona fide* private placement." (Pl. Mem.

26) He notes that a shareholder list made available to him shows over one hundred holders, some with holdings as small as 2,500 shares, circumstances suggesting to him that the offering was not limited to the sort of investors to which the Supreme Court referred in *Ralston Purina* in defining Section 4(2)'s private placement exemption. Defendants respond by noting that there is no necessary inconsistency between the existence of a Section 4(2) exemption and either of the facts relied upon by plaintiffs. They point also to the subscription agreement, with its requirement that would-be purchasers represent that they were accredited investors who had received all of the information they desired.

While there no doubt will be circumstances in which an issuer believes in good faith, albeit mistakenly, that its sales efforts have kept it within the limits of Section 4(2),[8] it is well established that the burden of proving the existence of an exemption from registration under the Securities Act is on the person claiming it. *E.g., Ralston Purina Co.,* 346 U.S. at 126–27, 73 S.Ct. at 985; *SEC v. North American Research & Development Corp.,* 424 F.2d 63, 71 (2d Cir.1970); *SEC v. Galaxy Foods, Inc.,* 417 F.Supp. 1225, 1242 (E.D.N.Y.1976), *aff'd,* 556 F.2d 559 (2d Cir.), *cert. denied,* 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977). Moreover, any unfairness that might be occasioned would be mitigated by the issuer's ability to defeat a purchaser's claim or interpose a counterclaim for fraud where that purchaser had misled the issuer to its detriment. *See Zissu v. Bear, Stearns & Co.,* 627 F.Supp. 687, 692 (S.D.N.Y.), *aff'd in part,* 805 F.2d 75 (2d Cir.1986); *Barnebey v. E.F. Hutton Co.,* 715 F.Supp. 1512, 1522–23 (M.D.Fla.1989); *cf. Weinberg v. Lear Fan Corp.,* 627 F.Supp. 719, 723 (S.D.N.Y.1986). In consequence, bearing in mind the remedial purpose of Section 12(2), this Court holds that the burden rests with the defendants in this case to establish that this offering was covered by a statutory exemption. The fact that the PPM indicates that the offering was so structured

---

8. For example, an issuer may have no practical alternative to reliance upon the word of the prospective buyer as to his or her net worth, income, sophistication or other characteristics relevant to determining whether he or she is an accredited investor.

does not mean that plaintiff cannot prevail on the Section 12(2) claim under any facts that might be proved within the confines of the existing pleadings. Accordingly, the motion to dismiss the Section 12(2) claim in its entirety [9] must be denied.

*The Miscellaneous Claims*

■ The complaint complains also that the 1994 financial statements disclosed that defendant Wartenberg had been paid $18,000 in rent after the offering and that the company on August 1, 1994 bought two million shares of its common stock from defendant Raymond Dirks for ten cents per share. While these allegations involve self-dealing and perhaps hint at corporate mismanagement, they raise no legally sufficient claims under the federal securities laws. There is no suggestion that there was any deficiency in the PPM related to the purchase from Dirks; indeed, the PPM was issued long before the purchase. And while the PPM did indicate that SuperAnnuities hoped to lease space on commercially reasonable terms, the complaint does not allege that the rental from Wartenberg either was envisioned at the time of the offering or that the terms on which it was procured were not commercially reasonable. *Cf. Luce,* 802 F.2d at 55 (affirming that allegations of mismanagement do not state a claim under Section 10(b); allegations must assert fraud in connection with purchase or sale of securities).

■ Finally, Count V of the complaint seeks to enforce an alleged right under the Arizona statutes to inspect SuperAnnuities books and records. This claim has no factual or legal nexus in common with the lone surviving claim. The requirements of 28 U.S.C. § 1367(a) are not met. Accordingly, the Court lacks subject matter jurisdiction over this claim.

*Conclusion*

The motions of defendants Nolan K. Bushnell, David L. Dirks, Raymond L. Dirks, Lory E. Roston and Thomas Wartenberg to dismiss the complaint for failure to state a claim upon which relief may be granted are granted as to Counts I through IV except insofar as the complaint alleges that the defendants violated Section 12(2) of the Securities Act and committed common law fraud with respect to the alleged misrepresentation or omission in connection with the payment of commissions to or for the benefit of officers and directors with respect to the sale of shares in the offering. The motions are granted as to Count V on the ground that the Court lacks jurisdiction over the subject matter of that claim.

SO ORDERED.

---

9. This does not affect the conclusion that certain aspects of the Section 12(2) claim fail because plaintiff's grievances fall short of alleging material misrepresentations or omissions.